MB  D.C.

ELECTRONIC

May 2, 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA.- MIAMI

# 11-60957-Civ-COOKE

## PETITION FOR WRIT OF HABEAS CORPUS

### UNDER 28 U.S.C. 2254

Prisoner's name:          **ROBERT RIMMER**

Prisoner's number:        **DOC No. A649748**

Place of Confinement:     **UNION CORRECTIONAL INSTITUTION**

                          **Raiford, Florida**

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

## FORT LAUDERDALE DIVISION

ROBERT RIMMER,

    Petitioner,

v.                                    CASE NO.

EDWIN G. BUSS,
    Secretary, Florida
    Department of Corrections,

    Respondent,

and

PAMELA JO BONDI,
    Attorney General,

    Additional Respondent.
_____/

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## INTRODUCTION

Pursuant to 28 U.S.C. 2254, Mr. Rimmer presents the instant petition for habeas corpus relief. Violations of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution during Mr. Rimmer's trial, penalty phase and direct appeal caused him to be wrongfully convicted of murder and sentenced to death. Mr. Rimmer urges this Court to allow him to be fully and fairly heard.

## STATEMENT OF THE CASE AND FACTS[1]

1.    The Circuit Court for the Seventeenth Judicial Circuit, in and for Broward County, Florida, entered the judgment of convictions and sentences of death at issue.

2.    On May 28, 1998, Robert Rimmer was indicted with two counts of first degree murder, three counts of armed robbery, four counts of armed kidnaping, one count of attempted armed

---

[1]Citations in this petition are as follows: References to the record on direct appeal are designated as "R. ____." References to the supplemental record on direct appeal are designated as "SR. ____." References to the postconviction record on appeal are designated as "SPC-R. ____." References to the second postconviction record on appeal are designated as "2SPC-R. ____." References to exhibits entered at the postconviction evidentiary hearing are designated as "Ex. ____." All other references are self-explanatory or otherwise explained herewith.

robbery, and one count of aggravated assault (R. 2089-92).[2]  At Mr. Rimmer's jury trial, which commenced in January, 1999, the following facts were elicited:

3.   At approximately 12:00 p.m., on May 2, 1998, a robbery-homicide occurred at the Audio Logic in Wilton Manors.  Before leaving the scene, the perpetrators shot and killed Bradley Krause and Aaron Knight.  Witnesses Joe Moore, his girlfriend Kimberly Davis-Burke, her toddler daughter and Luis Rosario were left physically unharmed.

4.   Moore, Davis-Burke and Rosario all had a similar account of what occurred at the Audio Logic: At approximately 12:00 p.m., Rosario was grabbed from behind and told to lie down inside the bay area of the store (R. 767).  Someone then came up to Rosario and taped his hands behind his back with duct tape (R. 772).

5.   Moore was walking out of the bay area of the Audio Logic when a black male with a gun in his waistband approached him and told him to go back inside the bay area and lie down on the floor (R. 879-80).  Moore complied and lay on the floor with his face down (Id.).  Moore's hands were taped together behind his back by a black male whose face he never saw (R. 885).  Moore's wallet and cell phone were taken from him (R. 886).

6.   Davis-Burke was sitting in the waiting area around noon

---

[2]Mr. Rimmer was tried jointly with codefendant Kevin Parker.

3

when she noticed a vehicle pull in near the front of the store (R. 792). The vehicle was a Kia Sephia. A black male exited the vehicle and entered the front door of the store (R. 793). Once inside, the man kneeled down and looked in the display case (Id.). Davis-Burke's daughter walked over to the man who took her hand and walked her back to her mother (Id.). Davis-Burke recalled the man walking toward the bay area and then did not see him again (R. 796). Davis-Burke identified Kevin Parker as the man who exited the Kia Sephia and entered the Audio Logic (R. 795).

7. A few minutes later another black man approached Davis-Burke and told her that her boyfriend called her, so she went into the bay area (R. 797). Davis-Burke identified Mr. Rimmer as the man who approached her (R. 799). Davis-Burke sat down and saw the same individual as before in the storeroom and moving boxes (R. 803). She also saw another individual moving boxes (Id.).

8. While Rosario, Moore and Davis-Burke were sitting and/or laying on the ground, cars were moved inside the bay area and a Ford Probe was loaded with stereo equipment (R. 774, 804, 888-90). Rosario and Moore heard a conversation about the prices of items being moved into the vehicle and one of the perpetrators ask an employee of the store if there were any guns in the store (R. 774-75, 886).

<center>4</center>

9.   Also, Davis-Burke saw the perpetrator she identified as Mr. Rimmer with a gun.  Both Davis-Burke and Moore testified that the perpetrator kneeled down next to Knight and asked what kind of gun it was (R. 806, 894).  He also asked Knight about any surveillance equipment and the key to the cash register (R. 807-08, 891).  Knight gave him the key to the cash register (R. 808).  Davis-Burke also saw him move her vehicle (R. 837).

10.   Rosario and Moore then heard a car start and begin to leave, but then it was driven back into the bay area (R. 776, 895).  The perpetrator exited the car and asked one of the employees of the store if "he knew him" (R. 777, 895-96).  Even though the employee said "no", Rosario heard a gunshot (Id.).  Moore saw the employee shot in the head (R. 896).  Likewise, the shooter approached Davis-Burke and told her to lie down because he did not "want this to get on you." (R. 809).  She then saw Knight shot.[3]  At this point, Moore jumped up, but the shooter told him to get on the ground (R. 812, 897).

11.   The perpetrators then walked over to the other employee and shot him (R. 778, 812).[4]  The gunman then told the remaining victims to "have a nice day" (R. 779, 812, 898).  The shooter entered the Ford Probe and drove away (R. 813, 898).

---

[3]Knight died instantly (R. 1114).  The cause of death was a gunshot wound to the head (R. 1108).

[4]Krause lost consciousness instantly (R. 1114).  The cause of death was a gunshot wound to the head (R. 1113).

5

12.   Rosario described the shooter as a black male, 6'2"
tall and wearing a baseball cap pulled down almost to his nose
(R. 768-69, 783).  Despite the fact that Rosario believed he
could identify the shooter, he was unable to identify anyone from
the photo or live line-up as the perpetrator (R. 780-81, 783).

13.   Moore said that the shooter, who he later identified as
Mr. Rimmer, was not wearing glasses during the crimes (R. 902).
He also described the shooter as 5'7" - 5'9" tall, 150-160 lbs.,
with reddish brown skin and a hat (R. 903, 907).  Moore described
the Probe as having peeling tint on the windows (R. 907).

14.   Davis-Burke described the shooter, who she later
identified as Mr. Rimmer, as a black male, 5'8" - 5'9" tall, 175
lbs., wearing a baseball cap pulled down a little bit to his eyes
with the bill of the cap at a straight angle downward (R. 797-98,
834, 838).  She did not recall the shooter wearing eyeglasses (R.
833), and she was not sure if he had any facial hair (R. 834).
Davis-Burke also described the Probe as having alloy wheels (R.
836).[5]

15.   As the events unfolded over the next week, Mr. Rimmer
became a suspect in the robbery-homicides that occurred on May 2,
1998.  On May 4, 1998, Davis-Burke met with a sketch artist (R.
814).  After the sketch was completed, Moore was shown the sketch

------

[5]On May 10, 1998, Mr. Rimmer was 6'2", 190-200 lbs (R.
1252).  At the time of the live line-up, Mr. Rimmer had lost
weight (Id.).

6

(R. 900).  He was satisfied with it.

16.   Michael Dixon, owner of the Audio Logic, was faxed a
copy of the composite sketch (R. 629).  Dixon did not identify
anyone from the sketch (R. 680), but faxed it to other business
owners (R. 629).  Shortly thereafter, an individual named John
Ercolano believed that he could identify the individual depicted
by the sketch (R. 1072).

17.   Ercolano believed that the sketch resembled Mr.
Rimmer.  He had met Mr. Rimmer in February, 1998, when he (Mr.
Rimmer) came into his store about some problems he was having
with his car stereo (R. 1073, 1080).  Mr. Rimmer complained about
the installation completed by the Audio Logic employees (R.
1076).[6]

18.   After assisting with the composite sketch and based on
the information from Ercolano, Davis-Burke was shown a photo
line-up by Detective Lewis (Id.).  When Davis-Burke looked at the
photos, Detective Lewis told her to pick out the person who most

---

[6]Based on Ercolano's statements, Dixon reviewed his records
and determined that on December 12, 1997, Mr. Rimmer had some
stereo equipment installed in his Oldsmobile at the Audio Logic
in Wilton Manors (R. 632-36).  Dixon then recalled that he had
met Mr. Rimmer on a few occasions, the first time in November,
1997, at the Audio Logic in Davie; Mr. Rimmer had requested a
stereo system be installed in his Oldsmobile (R. 640).  However,
due to his volume of business, Dixon could not accommodate Mr.
Rimmer (R. 642).  Mr. Rimmer returned after Thanksgiving, but
Dixon still did not have time to install the stereo system so he
advised Mr. Rimmer to take his vehicle to the Wilton Manors store
(Id.).  Sometime after December 12th, Mr. Rimmer returned to the
Davie store due to a malfunction in the stereo system (R. 643).

resembled the shooter (R. 843). She chose two individuals from the line-up.[7] The first photo she chose was not Mr. Rimmer (R. 845). However, because Detective Lewis told her that Moore had selected Mr. Rimmer, she then chose him. At trial, Davis-Burke explained that even then, she "wasn't saying these are the guys. From what I can remember, they look like the person that most fits the description out of all the pictures he showed me." (R. 845).[8]

19. When Moore was shown the photo line-up, he selected Mr. Rimmer's photo as being the shooter (R. 902).[9] Detective Lewis told Moore that he and Davis-Burke selected the same photo (R. 905). He also told Moore that Mr. Rimmer had been arrested and was in possession of Moore's wallet (R. 908). Later, Davis-Burke and Moore selected Mr. Rimmer from a live line-up (R. 816, 902).

20. On May 10, 1998, law enforcement attempted to locate Mr. Rimmer and search his vehicle. Mr. Rimmer engaged the police in a chase (R. 985-91). During the chase, Officer Kelley observed Mr. Rimmer throw objects from his vehicle (R. 993). The

---

[7]Davis-Burke testified that "four of the photographs didn't look anything like the characteristics of the guy I thought committed the crime." (R. 844).

[8]Trial counsel attempted to suppress the identification of Davis-Burke (R. 2176-78). The trial court denied the motion (R. 2194).

[9]Trial counsel attempted to suppress the identification of Moore (R. 2176-78). The trial court denied the motion (R. 2194).

8

objects included a wallet with Moore's license inside (R. 1008), and a firearm (R. 1014). Upon exiting his vehicle, Mr. Rimmer ran and was apprehended (R. 992). Mr. Rimmer was searched and had $896.00 (R. 1305).

21. Mr. Rimmer's vehicle was searched. Based on a lease agreement seized from Mr. Rimmer's vehicle, the police learned that on May 7, 1998, he rented a storage space (R. 972, 1198). When law enforcement searched the storage space they found several items of stereo equipment (R. 1199-1200).[10] Dixon identified the items as merchandise from the Audio Logic (R. 649-62).

22. During the initial investigation of Mr. Rimmer, law enforcement also received information that the composite sketch of the individual seen by Davis-Burke in the waiting area of the Audio Logic was Kevin Parker. Based on this information, Detective Lewis sought to interview Parker. In mid-May, Parker's girlfriend, Jenette Potter-Mallard, learned that the police were looking for Parker (R. 953). She encouraged Parker to call Detective Lewis, which he did (Id.). When interviewed by the police, Potter-Mallard told them that she had met Mr. Rimmer

---

[10]Trial counsel attempted to suppress an organizer, lease agreement and items found at the storage unit (R. 7). Trial counsel argued that the organizer, which contained the lease agreement, was beyond the scope of the search warrant of Mr. Rimmer's vehicle and that all of the items found at the storage unit were fruit of the poisonous tree (R. 10). The trial court denied the motion (R. 11).

9

through Parker (R. 931).  She had seen Parker and Mr. Rimmer together a few times (R. 957).  She recalled seeing Parker and Mr. Rimmer talking once outside of her apartment (R. 936). Potter-Mallard did not know when the conversation occurred, although it may have been in the beginning of May, 1998 (R. 935).

23.  Sometime after May 2, 1998, Parker told Potter-Mallard that he had been at the Audio Logic where he saw a little girl and her mom in the waiting area (R. 941).  Parker also said that he walked to the back of the store, saw some people and left (R. 950).  Parker denied being involved in the crimes (R. 962).

24.  Over the next several months, Deidre Bucknor, an employee of Broward County Sheriff's Office, compared numerous fingerprints that were obtained from the crime scene and from the items recovered from the storage unit (R. 1126).  She identified some fingerprints as belonging to Mr. Rimmer and Parker (R. 1129, 1134).  However, numerous fingerprints were unidentified, including fingerprints from Davis-Burke's vehicle (R. 1140-41), the door leading to the office at Audio Logic (R. 1141), the front door of the Audio Logic store (R. 1143), the cash register (R. 1143), the shelf in the storage area (R. 1144), the duct tape used to bind the victims (R. 1144-45), and other equipment and boxes (R. 1141, 1145-48).  Indeed, at least fifty prints were of value but unidentified (Id.).

25.  In Mr. Rimmer's defense, trial counsel explained to the

10

jury in his opening statement: "[T]he defense in this case is
Robert Rimmer did not commit those crimes and he was not present
at the Audio Logic store on May 2nd, 1998" (R. 549). Trial
counsel also presented evidence that Mr. Rimmer wore glasses all
of the time because he was "legally blind without correction" (R.
1322-23; see also 1344-45). Mr. Rimmer's eyesight was 20/400
without correction (R. 1325-26).[11] Also, counsel presented the
testimony from the booking officer of Mr. Rimmer's prior arrest
in March, 1998, that he was wearing glasses (R. 1290)[12]; and,
that on the evening he was arrested for the crimes at hand, Mr.
Rimmer was again wearing glasses (R. 1298).

　　26.  Trial counsel also presented testimony that Mr. Rimmer
drove an Oldsmobile and his wife drove a blueish-purple Ford
Probe (R. 1345).[13] Mr. Rimmer's wife testified that on the day
of the crimes, Mr. Rimmer took his son fishing at around 8:00 or
9:00 a.m. in the Oldsmobile and returned around 3:30 p.m. (R.
1355). Meanwhile, she used the Probe to go to the laundromat (R.

---

　　[11]Mr. Rimmer had purchased a new pair of glasses on February
23, 1998 (R. 1311).

　　[12]In rebuttal, the State presented the testimony of two
investigating officers who said that Mr. Rimmer was not wearing
glasses when he was arrested in a separate incident on March 25,
1998 (R. 1395, 1403).

　　[13]In rebuttal, the State presented the testimony of two
investigating officers that when Mr. Rimmer was arrested in a
separate incident on March, 25, 1998, he stated that he was
driving the Probe (R. 1396, 1403).

1346-47).  On cross-examination, the State questioned Mrs. Rimmer about her husband's income.  The State showed her payment stubs which indicated the Mr. Rimmer made just over $100.00 every other week (R. 1368).

27.  In rebuttal to the evidence of Mr. Rimmer's eyesight, the State presented Officer Kelley to discuss his own eyesight, which was 20/300 (R. 1404).  Officer Kelley described what he could see without his glasses and told the jury that he had driven previously without his glasses and not gotten into any accidents (R. 1404-05).  Finally, over the defense's objection, Officer Kelley assisted in a demonstration where the trial prosecutor lay on the floor and instructed Officer Kelley to point his finger at his (the trial prosecutor's) head (R. 1406).[14]

28.  During the State's closing argument, the trial prosecutor emphasized the importance of the jury instruction regarding principals (R. 1492).  Meanwhile, trial counsel emphasized that being in possession of the stolen property days after the crime did not mean that Mr. Rimmer was at the Audio Logic on May 2, 1998, and guilty of murder (R. 1516).

29.  During deliberations, the jury had numerous requests

---

[14]The Florida Supreme Court found that the trial court erred in permitting Officer Kelley to testify in rebuttal. Rimmer v. State, 825 So. 2d 304, 321 (Fla. 2002).  However, the court divided, four to three, in favor of finding that the error was harmless. Id. at 322, 334.

12

for evidence concerning the identification of Mr. Rimmer by the eyewitnesses, including the composite sketch, photo line-up, a read back of Davis-Burke's testimony, the fingerprint evidence photos of the live line-up, Davis-Burke's sworn statement,[15] the store display and Mr. Rimmer's day planner (R. 1616). The jury also asked a question indicating some confusion about the instruction regarding principals (R. 1715).

30. On January 28, 1999, the jury found Mr. Rimmer and Parker guilty as charged (R. 2283-93). During the penalty phase proceedings, the State presented victim impact testimony, and it also introduced testimony that Mr. Rimmer had previously been convicted of two prior violent felonies. In mitigation, trial counsel presented the following: Mr. Rimmer's father, Louis Rimmer, told the jury that he and Mr. Rimmer's mother had fought often when he was young (R. 1870). The couple divorced and the children remained with their father (R. 1868). However, a few years later, Mrs. Rimmer took her children to North Carolina without permission (R. 1868-69). She told her children that their father had died (R. 1869). A few months later, Louis Rimmer found his children and took them back to Ohio (R. 1870). Eventually, Louis Rimmer sent his children to live with their

---

[15]The jury was instructed that Davis-Burke's sworn statement was not evidence (R. 1641). During cross-examination of Davis-Burke, trial counsel impeached her several times with her prior sworn statement (See R. 834, 836, 849, 853, 856-59).

13

mother in Florida (R. 1872).

31.  The jury also learned that Mr. Rimmer had four children, one of whom was not his biological child, but that he had raised since she was an infant (R. 1873, 1936-37).  Mr. Rimmer spent time with his children; he took them to the park or fishing, and often helped with their homework (R. 1939, 1942-43). Mr. Rimmer also joined the PTA at their school (R. 1939), and he was a good friend and community member according to Henry Morris (R. 1881-86).  Mr. Rimmer attended church and worked with kids in gangs (R. 1882-83).

32.  Dr. Martha Jacobson testified that Mr. Rimmer suffered from a schizophrenic disorder with some mood disorder and depression (R. 1904).  Dr. Jacobson believed that Mr. Rimmer's condition was chronic (R. 1901).  She formed her conclusions based on some psychological testing and an interview with Mr. Rimmer (R. 1893-94).  The results of Mr. Rimmer's testing demonstrated a bizarre thought process, paranoia and mania (R. 1896-97, 1899).  Dr. Jacobson explained that Mr. Rimmer's results showed that he was not in touch with reality and that he hallucinated (R. 1898).

33.  On cross-examination, the State elicited that Dr. Jacobson had no evidence of Mr. Rimmer having mental problems in the past (R. 1910-11).  And, though Dr. Jacobson informed the jury that Mr. Rimmer told her that he had seen a mental health

14

professional while previously incarcerated, she admitted that she was never provided records to confirm that information (R. 1914-15). Thus, during the State's closing argument, the State referred to Dr. Jacobson's testimony as "mental mumbo-jumbo" (R. 1951). And, the State emphasized that there was no factual basis to support Dr. Jacobson's opinions (Id.). Instead, the State told the jury that Mr. Rimmer had an antisocial personality disorder (R. 1959).

34.    Following the conclusion of the penalty phase, the jury recommended the death penalty for both murders by a vote of 9 - 3 (R. 2320). Thereafter, a Spencer hearing was held in March, 1999, during which trial counsel presented testimony from Dr. Michael Walczak and Mr. Rimmer's mother. Dr. Walczak confirmed Dr. Jacobson's diagnosis (R. 2011), and he also told the trial court that Mr. Rimmer suffered an abusive childhood (R. 2013). Lilly Rimmer, Mr. Rimmer's mother, explained that she had taken her children from their father but she presented a somewhat different picture of Louis Rimmer, telling the trial court that he was not involved with his children and refused to let her have contact with them (R. 2049-51).

35.    On March 19, 1999, the trial court sentenced Mr. Rimmer to death, finding six aggravating factors had been established: (1) the murders were committed by a person convicted of a felony and under a sentence of imprisonment; (2) the defendant was

15

previously convicted of another felony involving use or threat of violence; (3) the murders were committed while the defendant was engaged in a robbery and kidnaping; (4) the murders were committed for the purpose of avoiding or preventing lawful arrest; (5) the murders were especially heinous, atrocious, or cruel (HAC)[16]; and (6) the murders were cold, calculated, and premeditated (CCP) (R. 2383-99).  The trial court found no statutory mitigating circumstances and gave the nonstatutory mitigation little weight (Id.).

36.  On direct appeal, a divided court affirmed Mr. Rimmer's convictions and sentences. Rimmer v. State, 825 So. 2d 304 (Fla. 2002).  The United States Supreme Court denied certiorari on November 18, 2002.

37.  On November 5, 2003, Mr. Rimmer filed a postconviction motion in the state circuit court (SPC-R. 470-756).  The motion was subsequently amended on September 15, 2004 (R. 1878-903).  Thereafter, an evidentiary hearing was held on May 9-12, 2005.  The hearing involved several issues, including claims based on ineffective assistance of counsel at the guilt and penalty phases, a conflict issue, and violations of Brady v. Maryland.

38.  At the evidentiary hearing, attorney Richard Garfield

---

[16]On appeal, the Florida Supreme Court found that the evidence did not support the HAC aggravator. Rimmer, 825 So. 2d at 327.

16

testified that he had been appointed to represent Mr. Rimmer at the guilt phase of his capital trial (2SPC-R. 598). The theory of the defense was that someone other than Mr. Rimmer committed the offense and that Mr. Rimmer came into possession of the stolen items at a later date (2SPC-R. 608). Trial counsel wanted to attack the identifications of the eyewitnesses (2SPC-R. 609).

39. Testimony was presented at the postconviction evidentiary hearing concerning the validity of the eyewitness identifications of Mr. Rimmer as the perpetrator. All of the individuals who knew Mr. Rimmer and saw him regularly confirmed that he wore glasses in order to see clearly, including his mother, his employer and his friends (2SPC-R. 45, 99, 254).

40. Dr. Gerald Tepler, an optometrist, testified that Mr. Rimmer needed to wear corrective lenses in order to see clearly (2SPC-R. 241). And, Mr. Rimmer's vision records[17] revealed that he had previously suffered from corneal ulcers (2SPC-R. 242). The condition often resulted in patients not wearing contact lenses (Id.). Indeed, Mr. Rimmer's vision records revealed no prescription for contact lenses, though the State of Florida requires such a prescription to obtain contact lenses (2SPC-R. 243).

41. In addition, Dr. Tepler opined that the comparison of

---

[17]Trial counsel recalled obtaining Mr. Rimmer's Department of Corrections medical records, but did not recall reviewing them (2SPC-R. 611).

17

Detective Kelley's vision to Mr. Rimmer's vision was an inaccurate and ineffectual comparison (2SPC-R. 244-45, 248).  Dr. Tepler explained that not only was their vision acuity different,[18] but also that other factors can contribute to how an individual reports perception of objects (2SPC-R. 245-46).

42.  At the evidentiary hearing, Dr. John Brigham, an eyewitness identification expert, testified about the eyewitness identifications in Mr. Rimmer's case.  Initially, Dr. Brigham set forth some of the basic facts concerning eyewitness identifications (2SPC-R. 364-65).  And, he explained that eyewitness identification is based on the process of memory (2SPC-R. 365-77).

43.  Dr. Brigham also outlined some of the specific factors that could have effected the identifications by Davis-Burke and Moore.  As to Davis-Burke, Dr. Brigham noted that the situation was tremendously stressful – she, her daughter and her boyfriend were all in danger; a weapon was present which likely caused weapon focus; the circumstances of the crime caused her to be distracted by multiple perpetrators and movement; the time she had to observe was limited; and the perpetrator had a hat pulled down over his face, past his eyes (2SPC-R. 380-81).  Likewise, Moore had even less opportunity to observe as he was laying face-

---

[18]Mr. Rimmer had 20-400 vision, whereas Detective Kelley had 20-300 vision.

18

down on the ground, and still the other factors effecting Davis-Burke were also present for Moore (2SPC-R. 388).

44.   Davis-Burke and Moore spoke to each other about the descriptions of the perpetrators (2SPC-R. 384).   Two days passed before Davis-Burke was asked to assist with a composite sketch, and before assisting with it she was exposed to more than fifty photos from a mug book (2SPC-R. 382-83).   Further, rather than create a composite for Moore, he was simply shown Davis-Burke's, which can cause a blending of memory or transference (2SPC-R. 389).

45.   At the photo line-up, Davis-Burke and Moore were instructed to approach the photos as if the perpetrator was included in them (2SPC-R. 385, 389).   And, Davis-Burke chose someone other than Mr. Rimmer as her first choice, which demonstrates the weakness of her memory (2SPC-R. 385).   At some point she was told that Moore had chosen Mr. Rimmer's photo which only reinforced her later identifications (Id.).

46.   Dr. Brigham opined that Davis Burke's and Moore's live line-up and in court identifications were meaningless, because they simply had the expectation that Mr. Rimmer was the person to choose (2SPC-R. 386-87, 390-91).   Trial counsel, however, did not consult with an eyewitness identification expert such as Dr. Brigham at the time of the trial (2SPC-R. 642).

47.   Evidence was also presented at the postconviction

evidentiary hearing regarding other suspects and uninvestigated leads.  At the time of trial, trial counsel inquired about some individuals who had been listed on a fingerprint report as "other suspects" (R. 3770).  Law enforcement officials told trial counsel they were unaware of who the individuals were or why they were listed as other suspects (2SPC-R. 617).

48.  At the postconviction evidentiary hearing, trial counsel and the trial prosecutor testified that neither one of them was aware that individuals from the Florida Department of Law Enforcement (FDLE) had authored reports or participated in the investigation of the case (2SPC-R. 624, 771).  Thus, neither had seen the FDLE reports admitted as a composite exhibit (Def. Ex. 43).  The reports included additional photo lineups that had been prepared to show to the eyewitnesses that did not include Mr. Rimmer (Def. Ex. 43).

49.  Trial counsel did not receive or obtain reports regarding the gun used in the shooting (Def. Exs. 44 and 45).  Nor did trial counsel receive or obtain reports concerning a robbery-homicide that occurred in Broward County, shortly before the Audio Logic crimes (2SPC-R. 641; see Def. Ex. 46).

50.  Trial counsel believed that he was provided reports from Officers Trephan and Schenk concerning leads that were not fully investigated (2SPC-R. 622; see Def. Exs. 41 and 42).  The reports contained information about other vehicles that matched

20

the description of the Ford Probe that were seen in the area
shortly after the offenses occurred (Id.).

51.   Though trial counsel attempted to minimize the
importance of the undisclosed documents, he did concede that he
would have wanted to know about other suspects in the case (2SPC-
R. 754).

52.   Another issue at the postconviction evidentiary hearing
concerned the identification of the Ford Probe that the
perpetrators had driven to leave the scene of the crime.   The
description by Davis-Burke and Moore of the vehicle was that it
was a bluish-purple and Moore recalled that the window tint was
peeling (R. 907).   Davis-Burke believed that the Probe had alloy
wheels and that a headlight was stuck in the up position (R.
836).

53.   Though Mr. Rimmer owned a bluish-purple Ford Probe, at
trial his wife testified that she drove the Probe, unless her
husband was taking it for a repair (R. 1345).   Indeed, she
testified that she was driving the car on May 2, 1998 (R. 1346-
47).   The Probe owned by Mr. Rimmer had neither a problem with
the tint nor alloy wheels.

54.   At the postconviction hearing, Stewart Weiss, an
experienced auto mechanic and business man, testified that a
common problem with the Ford Probe was that a headlight would get
stuck in the up position – he himself had previously repaired

21

that problem (2SPC-R. 89).[19]

55.    Sabrina Irving also testified at the postconviction
evidentiary hearing.  Irving, who worked with and was
romantically involved with Mr. Rimmer, contradicted the evidence
presented at trial that during the incident relating to Mr.
Rimmer's prior arrest in March, 1998, Mr. Rimmer was driving the
Probe (2SPC-R. 54).  Irving explained that on March 24, 1998, Mr.
Rimmer was driving her home from work when his wife started
following them (2SPC-R. 57).  Mr. Rimmer pulled into a bank
parking lot followed by his wife (Id.).  Mrs. Rimmer exited her
vehicle and began to hit Mr. Rimmer's vehicle with an object.
Mr. Rimmer got out of his car and tried to hold his wife's arms
so that she could not break the car windows.  Irving was certain
that she and Mr. Rimmer were driving the Oldsmobile, not the Ford
Probe (2SPC-R. 59).  In fact, the police allowed her to drive the
Oldsmobile home (2SPC-R. 60).

56.    Another issue raised at the postconviction evidentiary
hearing concerned the money found on Mr. Rimmer at the time of
his arrest.  At trial, the State presented evidence that Mr.
Rimmer was arrested with $896.00 on his person (R. 1305).  On
cross-examination of Mrs. Rimmer, the State showed her pay stubs
from John Knox Village that indicated her husband made just over

---

[19]Trial counsel admitted that he did not research the
problems with the Ford Probe (2SPC-R. 625-26, 628-29).

22

$100.00 every other week (R. 1368).

57.  At the evidentiary hearing, Mr. Rimmer's employment records were introduced which reflected that shortly prior to May 10, 1998, Mr. Rimmer had cashed out some of his annual leave hours, totaling $2286.26 (Def. Ex. 20).  Furthermore, these records reflected that Mr. Rimmer earned more money than was presented by the State at trial.  At the time of Mr. Rimmer's arrest, his payrate had increased significantly.  He was taking home approximately $600.00 every two weeks in April-May, 1998 (Id.).[20]

58.  Also raised at the posctonviction evidentiary was the issue of a conflict by trial counsel.  After Mr. Rimmer was found guilty of two counts of first degree murder, but before his penalty phase proceedings commenced, trial counsel penned a letter to the City of Wilton Manors on behalf of the lead detective, Anthony Lewis (See Def. Ex. 47).  Trial counsel commended Detective Lewis on his hard work and congratulated him on his victory in court against Mr. Rimmer (Id.).  Mr. Rimmer was unaware of the letter (2SPC-R. 652).

---

[20]Trial counsel testified at the evidentiary hearing, however, that although he had the records to explain why Mr. Rimmer possessed a large amount of money at the time of his arrest, he believed the issue was unimportant; likewise, it was unimportant to rehabilitate Mrs. Rimmer (2SPC-R. 603, 605-06).

23

59.   With regard to the ineffective assistance claim at the penalty phase, attorney Ken Malnik was initially appointed as penalty phase counsel for Mr. Rimmer (2SPC-R. 432).   Malnik withdrew less than two months before trial without having conducted any investigation, collecting records or retaining a mental health expert (2SPC-R. 432-33).

60.   After Malnick withdrew, on December 1, 1998, Hale Schantz was appointed as penalty phase counsel (2SPC-R. 436). Schantz recalled attempting to contact some of Mr. Rimmer's family members, friends and employers (2SPC-R. 438-39).   While Schantz conceded that it was his obligation to obtain background records and that they could be important in a penalty phase investigation (2SPC-R. 443, 452-53), he did not recall requesting or reviewing any background records, including school records, employment records or prison records (2SPC-R. 441, 443, 447-48, 450).

61.   Schantz testified that Mr. Rimmer provided him with individuals who had information about his background (2SPC-R. 453-54; Def. Exs. 21 and 22).   While Schantz did not interview all of the individuals provided by Mr. Rimmer, or look for anyone else (2SPC-R. 476), he did interview Mr. Rimmer's father, mother, wife and children, Henry Morris and two employees at John Knox Village (2SPC-R. 456, 460, 461, 462, 467, 468, 469).

62.   Schantz testified that he wanted to show the jury that

24

Mr. Rimmer was a great dad (2SPC-R. 479-80); and, that Mr. Rimmer had had a rough upbringing (Id.). Had Schantz had other information about Mr. Rimmer's childhood, or the fact that he was a great dad, he would have presented it to the jury (2SPC-R. 481).

63. As to mental health mitigation, Schantz filed a motion on December 16, 1998, requesting an expert be appointed (2SPC-R. 484). Dr. Martha Jacobson was appointed on December 31, 1998 (2SPC-R. 485). Schantz wanted Dr. Jacobson to determine whether Mr. Rimmer had any significant mental illness (2SPC-R. 484). But, Schantz gave Dr. Jacobson no background materials (2SPC-R. 143). Schantz would have presented Mr. Rimmer's abusive childhood or other non-statutory mitigation through Dr. Jacobson if that information had been obtained (2SPC-R. 586-87).[21]

64. At the postconviction evidentiary hearing, Mr. Rimmer's mother, Lilly Rimmer, explained that she married Mr. Rimmer's father because she was pregnant with their son, Louis O'Dell (2SPC-R. 15, 103). She did not want to marry him and was never happy about the situation (Id.; 108). Jeanette Rimmer, Mr. Rimmer's aunt by marriage, testified that there were problems between Robert's mother and father even before they were married (2SPC-R. 103). Louis Rimmer was unfaithful and spent money on

_____

[21]Finally, Schantz conceded that he had no reason for his failure to object to the trial prosecutor's improper arguments to the jury (2SPC-R. 505).

25

prostitutes (2SPC-R. 104). Despite the problems, the Rimmers had three sons – Louis O'Dell, Robert and Raymond (2SPC-R. 12). Lilly Rimmer believed that though she tried to be a good mother, she was unable to because of her own unhappiness (2SPC-R. 18). Jeanette Rimmer concurred and explained that there was a lot of fear and anger in the house but, "there wasn't love." (2SPC-R. 105).

65.  Lilly Rimmer also confirmed that, while married, she and her husband argued frequently – two to three times a week (2SPC-R. 15-16, 195-96). Oftentimes the arguments would result in physical violence (Id.). Louis O'Dell and Robert would try to intervene in the arguments and comfort their mother after them (2SPC-R. 17). However, Louis O'Dell testified that when he and Robert intervened, his father would then "whoop" them, though not in front of their mother (2SPC-R. 197).

66.  Lilly Rimmer described her husband as a "present, non-existent father" (2SPC-R. 16). She explained that her husband did not care for or spend time with his children (Id.). Jeanette Rimmer confirmed that Louis Rimmer was not nurturing and lacked parenting skills (2SPC-R. 112). He got angry with his children over minor things, or nothing at all (2SPC-R. 17, 125). During these times he would yell at them and make them feel bad (Id.).

67.  Lilly Rimmer left her husband and took her children after an incident in which she and her husband were physically

26

fighting and her eldest son brought a knife out and threatened his father (2SPC-R. 19, 196-97). Her husband pushed her son down a flight of stairs (Id.). Robert witnessed this incident (2SPC-R. 20). Lilly Rimmer did not tell her husband that she was leaving or where she was going (Id.). Nor did she tell her children until they were on the road (Id.). Her children were relieved to be away from the volatile situation of their home life (2SPC-R. 22). Louis O'Dell explained that he and his brothers were happy to leave their father because their mother was nice and calm when their dad was not around (2SPC-R. 199).

68.   Though Louis Rimmer did not seem very concerned about the loss of his children (2SPC-R. 114), a few months later he found Lilly and the children and asked that the children be allowed to accompany him to Ohio during their holiday break (2SPC-R. 23-24). Though the children did not want to go, Lilly allowed her husband to take them (Id.; 3218). The Rimmer children were scared and nervous about their father beating them (2SPC-R. 201). A few weeks later, Louis Rimmer refused to return the children to their mother (2SPC-R. 25). He told them that their mother would not be back (2SPC-R. 120).

69.   Jeanette Rimmer testified that while in their father's custody, her nephews, Robert Rimmer and his brothers, were fearful of their father due to the fact that he beat them (2SPC-R. 106, 111, 121). Several times a week, even daily, Mr.

27

Rimmer's father would beat his children with a razor strap, belts, extension cords, his hands and other implements for seemingly no reason (2SPC-R. 108, 120, 122, 125, 202). Louis O'Dell confirmed that the beatings were over small things or nothing at all – their dad was moody (2SPC-R. 202).

70. Their father also left the children unsupervised. Jeanette Rimmer tried to check on her nephews after work since she knew that their father was not home (2SPC-R. 116). She attempted to make sure her nephews had food to eat and completed their homework (2SPC-R. 117, 204). She found the boys unsupervised, without any toys or things to occupy their time (2SPC-R. 118). The children were also not allowed to leave the house (2SPC-R. 123, 203). Robert and his brothers were unhappy (2SPC-R. 201).

71. At some point, Robert's father began a relationship with a woman who had children of her own (2SPC-R. 124). His neglect and anger toward his own children grew. Louis Rimmer's family confronted him and urged him to seek psychological help (2SPC-R. 126). Louis Rimmer later reported that he was told he was depressed and needed medication (Id.).

72. In 1980, Lilly Rimmer moved to Florida and a few months later, her husband sent the children to live with her (2SPC-R. 28). Lilly's children, including Robert, were distant and confused (2SPC-R. 29). She noticed that the children had scars

28

and welts on their bodies as though they had been badly beaten
(2SPC-R. 30). Her children confirmed that their father had
beaten them, sometimes extremely badly (Id.). They also confided
that their father had kept them in the house for long periods of
time often without food (Id.; see also 2SPC-R. 124). Though the
children were happy to be with their mother, Louis O'Dell
explained that they were still afraid that their dad may come
back for them (2SPC-R. 207).

73. Lilly Rimmer felt her sons needed counseling and
attempted to get them some through school, but was never able to
(2SPC-R. 32). She also noticed that her eldest son, Louis
O'Dell, started to get in trouble. He had a temper that he could
not control (2SPC-R. 35-36). Robert spent much of his time with
his older brother and started to emulate his behaviors (2SPC-R.
209). He, too, began to skip school and get in trouble (2SPC-R.
39, 209). The State eventually removed him from home and placed
him in a group home because Lilly's parenting skills were
ineffective (Id.).

74. Robert Rimmer did not graduate, but did earn his GED
(2SPC-R. 40). He also started working at sixteen (2SPC-R. 41).
He worked for John Knox Village, a retirement home, for several
years where he was promoted and earned a scholarship to continue
his vocational training (SPC-R. 1879-80). Mr. Rimmer's
supervisor testified that he was an excellent employee who went

29

above and beyond the call of duty (2SPC-R. 95).

75.    While working at John Knox Village and going to school, Mr. Rimmer met Stewart Weiss, the owner of an auto repair shop (2SPC-R. 83), and George Wellington, one of the employees of the shop.   At the time of Mr. Rimmer's arrest, he voluntarily worked at Weiss' repair shop two or three times a week in order to learn more about auto repair (2SPC-R. 84).   Weiss described Mr. Rimmer as an honest, trustworthy volunteer employee who was eager to learn (2SPC-R. 85).   Indeed, Wellington trained Mr. Rimmer and also felt that Mr. Rimmer was trustworthy (2SPC-R. 252-53).

76.    Everyone who knew Mr. Rimmer considered him to be a concerned and caring father who spent time with his children (2SPC-R. 42, 66, 69, 80, 86, 97, 253).   They also knew him to be active in his church (2SPC-R. 45, 66), and a responsible employee (2SPC-R. 72).   Erlene Jennings, for example, knew Mr. Rimmer when he was in high school because he used to date her daughter (2SPC-R. 64).   Even after Mr. Rimmer and her daughter stopped dating, he continued to visit Jennings two or three times a week (Id.). Jennings stated that Mr. Rimmer was like a son to her (2SPC-R. 65).

77.    As to mental health mitigation, Dr. Martha Jacobson testified at the postconviction evidentiary hearing that she had evaluated Mr. Rimmer just a few weeks before his capital trial commenced (2SPC-R. 144).   Mr. Rimmer's penalty phase trial

30

attorney spoke to her briefly about the circumstances of the
crime and the fact that Mr. Rimmer had children (2SPC-R. 140-41).
However, trial counsel did not provide any background information
to Dr. Jacobson, nor did he provide any collateral sources of
information (2SPC-R. 143, 145).  Thus, Dr. Jacobson's opinion at
trial was based entirely on Mr. Rimmer's self-report and the
results of psychological testing.

78.  Though Mr. Rimmer provided some information about his
chaotic and abusive childhood, which was contained in Dr.
Jacobson's report, she was not asked about this information in
her testimony (2SPC-R. 151).  Dr. Jacobson testified that she had
no conference with the trial attorney in regards to mitigation
(2SPC-R. 153).  Likewise, at trial, she believed that Mr. Rimmer
committed the offense while under an extreme mental or emotional
disturbance, but the jury never heard this information (2SPC-R.
154).  Dr. Jacobson also believed that Mr. Rimmer was suffering
from psychosis at the time of the crime which impaired his
capacity to appreciate the criminality of his conduct, but the
jury never heard this information either (2SPC-R. 155).

79.  After meeting with Mr. Rimmer again during the
postconviction proceedings, Dr. Jacobson confirmed her previous
diagnosis of schizo-affective disorder which is a major mental
health disorder (2SPC-R. 159).  Mr. Rimmer suffered from a
paranoid and delusional thought process (Id.).  Dr. Jacobson

31

opined that Mr. Rimmer's condition is chronic (2SPC-R. 161). However, in postconviction, Dr. Jacobson conducted testing that ruled out the diagnosis of psychopath (2SPC-R. 162). The background materials provided in postconviction confirmed Dr. Jacobson's findings (2SPC-R. 166-67). She specifically noted that Mr. Rimmer's mental health records showed symptoms of his illness including nightmare visualizations and hallucinations and paranoia (2SPC-R. 167). The records independently corroborated her diagnosis and opinions and showed Mr. Rimmer's prior direct contact with mental health professionals (2SPC-R. 168). Dr. Jacobson also learned additional information about Mr. Rimmer's childhood, including information about the abuse and neglect and the fact that Mr. Rimmer's brother also had been prescribed with an anti-psychotic medication – information she considered mitigating (2SPC-R. 169-70). Dr. Jacobson conceded that, at trial, she did not provide an adequate description of the type of dysfunction experienced by Mr. Rimmer (2SPC-R. 170).

80. Dr. Faye Sultan, a clinical psychologist, also evaluated Mr. Rimmer in postconviction. Initially, after interviewing him, Dr. Sultan noticed Mr. Rimmer's paranoid thinking and thought distortion (2SPC-R. 273-74). She suspected that he had suffered mental damage from his traumatic childhood experiences (2SPC-R. 274). Dr. Sultan also reviewed records, including Mr. Rimmer's previous mental health records from the

32

late 1980s and early 1990s; she believed these records to be the most important background records about Mr. Rimmer (2SPC-R. 283). Dr. Sultan explained that the records showed that Mr. Rimmer suffered from longstanding disturbing psychological symptoms (2SPC-R. 286).

81.  Dr. Sultan also interviewed several people who knew Mr. Rimmer, including Lilly Rimmer, Jeanette Rimmer, Louis O'Dell Rimmer, Arlene Jennings and Andrea Brown.  Dr. Sultan described the collateral information:

> Those people helped fill in pieces of information that were crucial to me in formulating my opinion about the life Robert Rimmer had led, the psychological damage that had been done to him and the way he functioned psychologically as a young adult leading up to the time of the offense. They flushed out the picture, then provided a depth of understanding to me that I couldn't have had if I didn't have these conversations.

(2SPC-R. 309).

82.  Indeed, through those interviews, Dr. Sultan confirmed what Mr. Rimmer's mother believed, which was that when her children were returned to her in Florida she was ill equipped "to deal with the damage that had been done to her children in the time that they had been separated from her" (2SPC-R. 293).  Lilly Rimmer was quite overwhelmed by her sons' problems and unable to control their behavior (2SPC-R. 290).  Due to her sons' problems, as well as Lilly's own financial situation, it was impossible for her to be a stable parent for her children (2SPC-R. 291).

33

83.   Dr. Sultan also described that witnesses had reported Mr. Rimmer's peculiar thinking and that he seemed to overreact to things (2SPC-R. 297, 308).   Erlene Jennings reported that Mr. Rimmer could not let go of his suspiciousness or fears and at times could not disengage from situations (2SPC-R. 298).   And, Mr. Rimmer's first girlfriend, Andrea Brown, broke up with him because she believed he was mentally unstable.   Brown described Mr. Rimmer's bizarre behavior and reactions (2SPC-R. 308).

84.   Mr. Rimmer's brother, Louis O'Dell, described himself as "more than just a bad influence [on Robert]. He was an active antagonist" for his brother (2SPC-R. 303).   Louis forced Robert to smoke marijuana, skip school and assist him in his criminal endeavors (Id.).   Robert Rimmer's dependence on his brother began when they were children, being shuffled from parent to parent without notice or explanation (2SPC-R. 304).   Dr. Sultan also learned that Louis O'Dell had previously exhibited psychotic symptoms and been prescribed anti-psychotropic medications (2SPC-R. 306).

85.   Dr. Sultan also explained that the abuse suffered by Mr. Rimmer included "multiple layers" that were "extremely damaging" (2SPC-R. 296, 305).   Dr. Sultan diagnosed Mr. Rimmer with a paranoid personality disorder, though she believed in the past that he would have been classified as having a more acute psychotic disorder (2SPC-R. 314).   Dr. Sultan explained that Mr.

34

Rimmer's condition effects his day-to-day functioning (2SPC-R. 315). Mr. Rimmer's "psychiatric disorder greatly impairs his ability to reason rationally and calmly" and "his though process is characterized by suspiciousness and fear" (2SPC-R. 316).

86. Dr. Sultan concluded that based on her evaluation, Mr. Rimmer would have met the criteria for the statutory mental health mitigator that at the time of the offense he was under the influence of an extreme mental or emotional disturbance (Id.). Dr. Sultan also opined that at the time of the offense Mr. Rimmer's capacity to appreciate the criminality of his conduct was impaired (2SPC-R. 317).

87. Additionally, Dr. Sultan identified numerous non-statutory mitigators: Mr. Rimmer has been mentally ill throughout his adolescence and adulthood which interfered with his ability to function; he was the victim of severe physical abuse; he was the victim of severe emotional abuse and neglect[22]; and at the time of the offense Mr. Rimmer was attempting to "pull his life together" – he was working hard at his relationship with his children (2SPC-R. 319).

88. Subsequent to the conclusion of the postconviction evidentiary hearing, on December 18, 2006, the circuit court

---

[22]Dr. Sultan stated that the abuse and neglect Mr. Rimmer suffered "would have a profound impact on his functioning in the world and his ability to trust people, to formulate relationships, on his ability to struggle with what probably is genetic propensity toward mental illness." (2SPC-R. 318).

denied Mr. Rimmer's Rule 3.851 motion (SPC-R. 2407-31).  Mr. Rimmer's motion for rehearing was likewise denied (SPC-R. 2488-9).

89.   Mr. Rimmer appealed to the Florida Supreme Court, which affirmed the denial of postconviction relief on September 16, 2010. <u>Rimmer v. State</u>, Nos. SC07-1272, SC09-1250, slip op. (Fla. Dec. 16, 2010).[23]  Mr. Rimmer filed a motion for rehearing, which was denied on April 12, 2011.  The Florida Supreme Court's mandate issued on April 28, 2011.

### REQUEST FOR AN EVIDENTIARY HEARING

1.   Mr. Rimmer requests that this Court conduct an evidentiary hearing on the claims presented herein. 28 U.S.C. § 2254(e)(2) as amended by the AEDPA governs evidentiary hearings in federal habeas corpus cases.  In <u>Breard v. Greene</u>, 118 S.Ct. 1352, 1355 (1998), the United States Supreme Court essentially and simply reiterated that the language of § 2254(e)(2) precluded a habeas petitioner from being afforded an evidentiary hearing only "if he 'has failed to develop the factual basis of [the] claim in State court proceedings.'" (Citation omitted).

2.   Thus, "a federal court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a

---

[23]Mr. Rimmer also filed a state habeas petition, which was denied by the Florida Supreme Court in the same opinion.

claim in State court.'. . . If, on the other hand, the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under <u>Townsend [v. Sain</u>, 372 U.S. 293 (1963)]." <u>Cardwell v. Greene</u>, 152 F.3d 331, 337 (4th Cir. 1998). It is clear that "where an applicant has diligently sought to develop the factual basis of a claim for habeas relief, but has been denied the opportunity to do so by the state court, **§ 2254 (e)(2) will not preclude an evidentiary hearing in federal court**." <u>Id</u>. at 337 (emphasis added).

   3.   As the United States Supreme Court stated in <u>Williams v. Taylor</u>, 109 S. Ct. 1479, 1488 (2000),

> Under the opening clause of § 2254 (e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.  In this we agree with all other courts of appeals which have addressed the issue.  <u>See</u>, <u>e.g.</u>, <u>Baja v. Ducharme</u>, 187 F. 3d 1075, 1078-1079 (CA9 1999); <u>Miller v. Champion</u>, 161 F. 3d 1249, 1253 (CA10 1998); <u>Cardwell</u>, 152 F. 3d at 337; <u>McDonald v. Johnson</u>, 139 F. 3d 1056, 1059 (CA5 1998); <u>Burris v. Parke</u>, 116 F. 3d 256, 258 (CA7 1997); <u>Love v. Morton</u>, 112 F. 3d 131, 136 (CA3 1997).

   4.   If the petitioner sought an evidentiary hearing but was denied such a hearing on a claim, "§ 2254(e)(2) does not apply" and "the AEDPA does not preclude [the petitioner] from receiving an evidentiary hearing." <u>Miller v. Champion</u>, 161 F.3d 1249, 1253 (10th Cir. 1998).  In such instances, the federal court

essentially looks to pre-AEDPA law–that is, the standards set forth in <u>Townsend v. Sain</u>–to determine the need for an evidentiary hearing.

5.   Under <u>Townsend</u>, a federal court evidentiary hearing is required to be held "[i]f (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 372 U.S. at 313.

6.   Here, Mr. Rimmer was denied a full and fair hearing when the state circuit court prevented him from calling relevant witnesses in support of his claims for relief.  Prior to the evidentiary hearing, the State filed a Motion for Discovery (SPC-R. 1817-19).  In its motion, the State "question[ed] the propriety of compelling the appearance and testimony of certain witnesses for this collateral proceeding." (<u>Id</u>. at 1818).  At both a hearing on the motion and in a court-ordered written response, Mr. Rimmer provided detailed explanations of the relevancy for each challenged witness (<u>See</u> SPC-R. 1829-32, 1836-

38

75; 2SPC-R. 880-921).  The State subsequently filed a Motion to
Strike Witnesses (SPC-R. 1833-75).  In its order on the State's
motions, the circuit court ultimately found "insufficient
relevancy to any claim for relief to permit the calling" of
Kimberly Davis-Burke, Joe Moore, Louis Rosario, or Kevin Parker
(SPC-R. 1990-91).

     7.    Mr. Rimmer submits that he was denied a full and fair
hearing when the circuit court prohibited the aforementioned
witnesses from testifying.  The circuit court granted an
evidentiary hearing on Mr. Rimmer's claims of ineffective
assistance of counsel and <u>Brady</u> error, amongst others (SPC-R.
1815-16).  Within each of these claims were allegations which
directly related to the surviving eyewitnesses and Kevin Parker.
For example, regarding his guilt phase ineffective assistance
claim, Mr. Rimmer specifically alleged that Davis-Burke, Moore,
Rosario, and Parker would all be able to testify to information
which was unreasonably not brought out at trial or in the record
below (SPC-R. 1829-32, 1867-68, 1872-73).  Also, as to the
eyewitnesses, Mr. Rimmer asserted that it was necessary to
question them regarding their identifications in ways that trial
counsel did not in order to demonstrate trial counsel's
ineffectiveness for failing to obtain an eyewitness
identification expert.

     8.    With regard to Mr. Rimmer's <u>Brady</u> claim, trial

counsel's strategy was misidentification, and the eyewitness identifications were the only thing linking Mr. Rimmer to the scene of the crime.   Thus, Mr. Rimmer wanted to demonstrate that the information on other suspects should have been made part of the defense through effective cross-examination of the eyewitnesses and by attacking the State's investigation as a whole.   Likewise, Mr. Rimmer asserted that the eyewitnesses needed to testify as to how the information on other suspects would have affected their identifications.

9.   Further, as a showing of the relevancy of the surviving eyewitnesses, collateral counsel argued that it was necessary to bring out inconsistencies in their statements and testimony about the crime and the identification process which was not brought out at trial (SPC-R. 1820-24, 1838-75).   Such information was directly relevant to Mr. Rimmer's claims, as it is incumbent upon the defense to show the materiality of what was not presented or done in order to meet the prejudice requirements necessary for relief.

10.   As a result of the fact that Mr. Rimmer was denied a full and fair hearing in state court, he submits that an evidentiary hearing is warranted before this Court.   "It is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief."

40

Meeks v. Singletary, 963 F.2d 316, 319 (11th Cir. 1992) (quoting James v. Singletary, 957 F.2d 1562, 1573 n.17 (11th Cir. 1992)). See also Bertolotti v. Dugger, 883 F.2d 1503, 1509 (11th Cir. 1989)(noting that a federal evidentiary hearing "often is necessary in a first federal habeas petition").

<div align="center">**CLAIMS FOR RELIEF**</div>

By his Petition for Writ of Habeas Corpus, Mr. Rimmer asserts that his convictions and death sentences were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution for all the reasons set forth in the instant petition and presented to the Court in this proceeding.

<div align="center">**GROUND I**</div>

> **MR. RIMMER WAS DENIED AN ADEQUATE ADVERSARIAL TESTING AT THE GUILT PHASE OF HIS TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PREPARE MR. RIMMER'S DEFENSE AND TO CHALLENGE THE STATE'S CASE. AS A RESULT, THE CONVICTIONS ARE UNRELIABLE.**

All factual assertions contained in the procedural history and elsewhere in this petition are fully incorporated herein by specific reference. This claim is evidenced by the following:

**A.   INTRODUCTION**

1.   In Strickland v. Washington, 466 U.S. 668, 685 (1984), the United States Supreme Court explained that under the

<div align="center">41</div>

Sixth Amendment:

> . . . a fair trial is one which evidence subject
> to adversarial testing is presented to an
> impartial tribunal for resolution of issues
> defined in advance of the proceeding.

Defense counsel is obligated "to bring to bear such skill and
knowledge as will render the trial a reliable adversarial testing
process." Strickland, 466 U.S. at 685.  Thus, in order to insure
that an adversarial testing and, hence a fair trial, occurs,
certain obligations are imposed upon defense counsel. United
States v. Gray, 878 F.2d 702 (3rd Cir. 1989).  For instance,
courts have recognized that in order to render reasonably
effective assistance an attorney must present "an intelligent and
knowledgeable defense" on behalf of his client. Caraway v. Beto,
421 F.2d 636, 637 (5th Cir. 1970).  Moreover, an attorney is
responsible for presenting legal argument consistent with the
applicable principles of law. Davis v. Secretary for the
Department of Corrections, 341 F.3d 1310 (11th Cir. 2003);
Harrison v. Jones, 880 F.2d 1279 (11th Cir. 1989).

     2.   Counsel have been found prejudicially ineffective
for failing to impeach key State witnesses with available
evidence. Nixon v. Newsome, 888 F.2d 112 (11th Cir. 1989).  See
also Smith v. Wainwright, 799 F.2d 1442 (11th Cir. 1986).[24]

---

    [24]Counsel is also prejudicially ineffective for failing to
function as the government's adversary, Osborn v. Shillinger, 861
F.2d 612, 625 (10th Cir. 1988); for failing to raise objections,
to move to strike, or to seek limiting instructions regarding

Further, even if counsel provides effective assistance at trial in some areas, the defendant is entitled to relief if counsel renders ineffective assistance in his or her performance in other portions of the trial. <u>Horton v. Zant</u>, 941 F.2d 1449 (11th Cir. 1991). <u>See</u> <u>also</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986).

3.   As will be demonstrated herein, trial counsel's failure to use available evidence, to investigate, to challenge the State's case, and to make proper objections and argument, constitutes ineffective assistance of counsel.

## B.   INEFFECTIVE ASSISTANCE OF COUNSEL

### i.   Misidentification

4.   At trial and again at the postconviction evidentiary hearing, trial counsel stated that his theory of defense was misidentification (R. 130; 2SPC-R. 608).  Trial counsel was willing to concede that Mr. Rimmer was in possession of the stolen property after the robbery-homicide occurred, but that he had nothing to do with the robbery or homicides (2SPC-R. 603). The only evidence the jury heard that linked Mr. Rimmer to being present at the Audio Logic store on May 2, 1998, was the identifications of Kimberly Davis-Burke and Joe Moore.  Thus, the appearance of Mr. Rimmer and the identification procedures involved became a feature at the trial.  Yet, despite having

---

inadmissible, prejudicial testimony, <u>Vela v. Estelle</u>, 708 F.2d 954, 961-66 (5th Cir. 1983); and for failing to object to improper prosecutorial jury argument, <u>Vela</u>, 708 F.2d at 963.

additional readily available evidence to support his theory of defense, trial counsel failed to utilize it.

        *a.    Mr. Rimmer's vision records and lay testimony*

5.    At trial, Mr. Rimmer's counsel presented evidence that he wore glasses all of the time because he was "legally blind without correction" (R. 1322-23; see also R. 1344-45).  The State attempted to rebut the critical testimony by presenting evidence that Mr. Rimmer had not been wearing eyeglasses at the time of his previous arrest in March, 1998 (R. 1395, 1403).

6.    Trial counsel failed to investigate or present evidence contained in Mr. Rimmer's Department of Corrections' (DOC), medical files which would have corroborated the expert testimony about Mr. Rimmer's eyesight and explained why Mr. Rimmer did not wear contact lenses.  The DOC records contain information about an astigmatism and optic ulcers suffered by Mr. Rimmer which prevented him from wearing contact lenses.[25] Indeed, at the postconviction evidentiary hearing, Dr. Gerald Tepler, an optometrist, testified that patients do not want to wear contacts after suffering from corneal ulcers (2SPC-R. 242). Dr. Tepler also testified that Florida law requires a prescription for contact lenses, yet he saw no indication in Mr.

---

[25]None of the eyewitnesses to the crime described the gunman as wearing glasses.  Mr. Rimmer is severely near-sighted, needs glasses to see properly, and has worn glasses throughout his adult life.

Rimmer's vision records that he ever obtained a prescription after he suffered from the corneal ulcers (2SPC-R. 243).[26]

       *b.   Rebutting Officer Kelley's testimony*

    7.   As to the comparison that was made at trial by the State of Officer Kelley's vision and Mr. Rimmer's vision, Dr. Tepler testified at the postconviction evidentiary hearing that it was "very inaccurate to assess [Mr. Rimmer's] vision based on . . . another person's report of blur.  That's why you can't rely on a numerical assessment." (2SPC-R. 246).  Dr. Tepler stated that making a comparison based upon the numerical assessment leads to an inaccurate conclusion of another's vision because there are many other factors that effect an individual's vision (<u>Id</u>.).

    8.   Mr. Rimmer submitted before the state court that testimony similar to Dr. Tepler's was readily available at the time of Mr. Rimmer's trial; yet, trial counsel did nothing to rebut or address the misleading and inaccurate testimony and demonstration that the jury heard and saw.

       *c.   An eyewitness identification expert*

    9.   A key element of the prosecution's case was the testimony of three eyewitnesses to the crimes, only two of whom identified Mr. Rimmer as the gunman.  However, there were

---

    [26]In addition, trial counsel could have presented testimony from Mr. Rimmer's family, friends and co-workers that Mr. Rimmer always wore glasses (2SPC-R. 45, 99, 254).

problems with the witnesses' identifications.  Of primary concern were photo lineup identifications which, trial counsel argued, were conducted in an unacceptably suggestive manner.  Trial counsel attempted to have these identifications excluded (R. 2176-78).  A suppression hearing was held on December 8, 1998, after which the defense's motion was denied.  Subsequently, at trial, two eyewitnesses, Davis-Burke and Moore, identified Mr. Rimmer as the gunman.  Their testimony was the only evidence that linked Mr. Rimmer to the crime scene.

10.  Due to the nature of the State's evidence, which relied heavily upon eyewitness testimony to support its prosecution of Mr. Rimmer, it was absolutely imperative that trial counsel request the assistance of an expert in eyewitness identifications.  This was not an uncommon defense practice at that time.  See, e.g., McMullen v. State, 714 So. 2d 368 (Fla. 1998); Rogers v. State, 511 So. 2d 526 (Fla. 1987).

11.  In Florida, trial courts have discretion to admit expert testimony regarding eyewitness identification. McMullen, 714 So. 2d at 372.  Expert testimony of this nature should be admitted if it will assist the jury in understanding the evidence or in determining a fact in issue. See Fla. Stat. 90.702; Angrand v. Key, 657 So. 2d 1146, 1148 (Fla. 1995).  Courts have been willing to consider the presentation of expert testimony on the vagaries of eyewitness identifications where the State's case

46

hinges on such testimony. Rogers.  Yet in this case, trial
counsel failed to even petition the court for an expert to
support Mr. Rimmer's misidentification defense.

    12.  At the postconviction evidentiary hearing, Dr. John
Brigham testified about the eyewitness identifications in Mr.
Rimmer's case.  Initially, Dr. Brigham set forth some of the
basic facts concerning eyewitness identifications, including the
fact that there is a 50% error rate associated with such
identifications (2SPC-R. 364).  Indeed, eyewitness mistakes have
a serious impact on wrongful convictions – more so than any other
factor (Id.).  Despite the facts known about the fallibility of
eyewitness identifications, the general public is unaware of the
likelihood that eyewitnesses are wrong in their identifications
(2SPC-R. 361).  And, instead, jurors tend to credit eyewitness
identifications almost all of the time (Id.).  However, when
experts such as Dr. Brigham testify, jurors become more cautious
about eyewitness identifications (2SPC-R. 376).

    13.  Dr. Brigham also explained that eyewitness
identification is based on the process of memory (2SPC-R. 365-
66).  Thus, he outlined the stages of memory: 1) the acquisition
stage where factors such as opportunity to observe, stress, cross
racial identification, weapon focus, and the age, condition and
expectation of the eyewitness, all play a part in the acquisition
of the memory of the perpetrator; 2) the retention stage where

47

length of retention (before retrieval) and what happens during
that time can impact the ultimate stage of 3) retrieval (2SPC-R.
366-77).  During the retention stage, what an eyewitness sees and
hears can alter the actual memory of the perpetrator and transfer
can occur (2SPC-R. 369-70).  Thus, eyewitnesses who discuss the
memory of a perpetrator, view mug books and are exposed to media
coverage, can alter the true memory of the perpetrator (Id.).
Eyewitnesses do not realize that transfer is occurring, but
instead the factors described tend to reinforce a wrongful
identification (2SPC-R. 370).  When transfer occurs the
confidence of an eyewitness increases and the witness seems to
become more certain about his description and perception of the
circumstances surrounding the original event change (2SPC-R. 372-
73).  Likewise, at the retrieval stage, what an eyewitness
sees and hears is critical in discussing the correctness of an
identification (2SPC-R. 375).  Line-ups and identifications are
often advertently or inadvertently suggestive and can become
valueless (Id.).

14.  Dr. Brigham also outlined some of the specific factors
that could have effected the identifications by Davis-Burke and
Moore.  As to Davis-Burke, Dr. Brigham noted that the situation
was tremendously stressful - she, her daughter and her boyfriend

were all in danger[27]; a weapon was present which likely caused
weapon focus; the circumstances of the crime caused her to be
distracted by multiple perpetrators and movement; the time she
had to observe was limited; and the perpetrator had a hat pulled
down over his face, past his eyes (2SPC-R. 380-81).  Likewise,
Moore had even less opportunity to observe as he was laying face-
down on the ground, and still the other factors effecting Davis-
Burke were present for Moore (2SPC-R. 388).

15.  Davis-Burke and Moore spoke to each other about the
descriptions of the perpetrators (2SPC-R. 384).  Two days passed
before Davis-Burke was asked to assist with a composite sketch,
and before assisting with it she was exposed to more than fifty
photos from a mug book (2SPC-R. 382-83).  Rather than create a
composite for Moore, he was simply shown Davis-Burke's, which can
cause a blending of memory or transference (2SPC-R. 389).

16.  At the photo line-up, Davis-Burke and Moore were
instructed to approach the photos as if the perpetrator was
included in them, i.e., like a multiple choice test (2SPC-R. 385,
389).  And, Davis-Burke chose someone other than Mr. Rimmer as
her first choice, which demonstrates the weakness of her memory
(2SPC-R. 385).  At some point she was told that Moore had chosen
Mr. Rimmer's photo which only reinforced her later

---

[27]Davis-Burke testified at trial that she was scared (R.
807).

49

identifications (Id.).  Dr. Brigham opined that Davis-Burke and Moore's line-up and in court identifications were meaningless, because they had the expectation to choose Mr. Rimmer (2SPC-R. 386-87, 390-91).

17.  At the postconviction evidentiary hearing, trial counsel testified that he did not consult with an eyewitness identification expert (2SPC-R. 395).  Trial counsel attempted to minimize the need to consult with such an expert by stating that the information used by experts was common sense (2SPC-R. 397).  However, trial counsel could not identify more than two of the factors involved in determining the accuracy of an identification (2SPC-R. 695-704).[28]

ii.  *Investigation of other suspects and leads*

18.  At trial, Deidre Bucknor of the Broward County Sheriff's Office testified that out of the 209 identifiable prints lifted in the investigation, not a single print lifted from the scene of the crime matched Mr. Rimmer (R. 1140-48).  The only latent prints that matched his were found on stereo equipment seized several days after the crime at Mr. Rimmer's storage facility.

19.  Bucknor's report contained a listing of those

_____

[28]Trial counsel admitted that he did not know that Davis-Burke was shown 50 photos prior to her compiling the composite sketch - arguably the most crucial fact to demonstrate her suggestibility.

individuals whose fingerprints were checked against the latent prints found at the scene (Def. Ex. 38).  In this report, several people were listed in addition to Parker and Mr. Rimmer (Id.).

20.  A deposition of Bucknor was scheduled by counsel for Parker on January 7, 1999, and was attended by Mr. Rimmer's trial counsel.  During the deposition, Bucknor stated that she was specifically told not to run the fingerprints of the other suspects listed on the report:

> Q: Were you asked to compare the known prints of anyone else to the fingerprint cards, the latents that were lifted, besides Mr. Rimmer and Mr. Parker?
>
> \* \* \*
>
> A: Looking at page one I did St. Louis.  I found him to be negative.  So he was the only other suspect that I searched.
>
> Q: You refer to him as a suspect.  Why do you refer to him as a suspect?
>
> A: That's what they called him.
>
> \* \* \*
>
> Q: Was there anybody else that you were asked to compare to what Detective Lewis had indicated was a suspect in the case?
>
> A: Just the victims.
>
> Q: Did you ever do any fingerprint examination on a Bernard Gilbert?
>
> A: I was told not to.
>
> Q: By who?
>
> A: Detective Lewis.

51

Q: Do you know the reason why?

A: No.

Q: The same as it relates to Greg Broughton?

A: Right, I was told not to.

Q: Do you have any idea why or what that's all about?

A: No.

(Def. Ex. 40). Bucknor's deposition was not transcribed by the time she testified at trial (2SPC-R. 620).

21. At Mr. Rimmer's trial, counsel never questioned Bucknor, Detective Lewis or Detective Howard about the other suspects or why Bucknor was told not to compare their prints to those at the scene. Likewise, trial counsel failed to conduct any further investigation or present any evidence regarding the other suspects identified by law enforcement.

22. Also, trial counsel failed to demonstrate that the State failed to follow up on other leads and suspects in the case. On May 2, 1998, after a BOLO was issued describing the vehicle in which the perpetrators left the crime scene, an individual reported seeing a vehicle matching the description in the area where the crimes occurred, being driven by a black male (Def. Ex. 42). Another black male was in the passenger seat (Id.). Officer Trephan received the report and observed the vehicle, parked in Wilton Manors, himself (Id.). The vehicle was suspect because it matched the description of the vehicle used in

the crimes: A faded purple Ford Probe with tinted windows and "mag" wheels (Id.).  Officer Trephan did no follow-up on the report.

23.  Not only was the lead itself valuable to the defense, but also the impeachment of the entire police investigation would have been helpful.  Certainly, a suspicious vehicle matching the description of that used in a recent crime and being driven by two black males, just as the BOLO indicated, and in Wilton Manors, should have been investigated.

24.  Officer Schenck from WMPD also failed to follow a lead when a Ford Probe was reported being seen driven by a black male with another black male passenger, shortly after the BOLO was issued (Def. Ex. 41).  No investigation was conducted into this lead.  As with the lead provided to Officer Trephan, the information would have illustrated the failure of law enforcement to adequately investigate.  Also, the mere fact that at least two other Ford Probes matching the description of the vehicle used in the crimes would have decreased the inculpatory evidence of Mr. Rimmer owning a similar car.

*iii   Rehabilitating witnesses*

25.  Throughout the trial, counsel attempted to show that Mr. Rimmer was not involved with the robbery-homicides that occurred at Audio Logic.  During the defense's case, Joanne Rimmer, Mr. Rimmer's wife, explained Mr. Rimmer's alibi.  She

testified that Mr. Rimmer was fishing with his son during the
time of the offenses (R. 1355).

26.    During the cross-examination of Mrs. Rimmer, the
prosecutor questioned her about how much Mr. Rimmer earned at his
job:

> Q: And he would bring home about a hundred,
> hundred and twenty dollars every two weeks,
> correct?
>
> A: No. No.
>
> Q: What was his net pay he would bring home?
>
> A: After they deducted insurance and
> everything, probably close to three.
>
> Q:  Are you saying close to like three
> hundred dollars, is that what you're saying?
>
> A: After they take out insurance and stuff.
>
> Q: Would you see the pay stubs from John Knox
> Village?
>
> A: Not all the time, no.
>
> Q: Well I just removed this organizer out of
> what is evidence as State's 90.  Do you recognize
> that piece of paper right there, don't you, that I
> just took out of the folder?
>
> A: No.
>
> Q: Do you recognize that as being an earning
> statement from John Knox Village of Florida?
>
> A: I don't know.
>
> Q: I'm sorry?
>
> A: That's not how I see his paychecks, no.
> It's an orange paper.

54

A: Well, the orange ones, isn't that the way they were back in 1997?

A: Yes.

Q: You recognize these orange ones?

A: Yes.

Q: They say John Knox Village of Florida. Net payment of this one, period ending 8-30-97 is $158.78 on this one?

A: Yes.

Q: And 8-16-97 is $134.05?

A: Yes.

Q: And here is another one, November 8th of 1997, $113.59?

A: Yes.

*  *  *

Q: Did the defendant, the defendant wasn't one who carried a lot of cash on him, correct?

A: No.

(R. 1368-69).[29]

27.   Prior to trial, Mr. Rimmer explained to his defense counsel that the reason he had so much money on him the night he was arrested was due to the fact that he had cashed out some of his annual leave hours from work.  However, though trial counsel obtained Mr. Rimmer's employment records which verified that Mr.

---

[29]During closing argument, the State argued that Mr. Rimmer was found with a large amount of money on him the night he was arrested (R. 1489-90, 1531-46).

Rimmer received an annual leave payout of $2,286.26 in late April and early May, 1998, (see Def. Ex. 20), trial counsel failed to present this evidence to the jury.

28. Furthermore, Mr. Rimmer's employment records showed that he earned more money than was presented during the cross-examination of Mrs. Rimmer. At the time of Mr. Rimmer's arrest, he was taking home about $600.00 every two weeks (See Def. Ex. 20).

29. Had trial counsel reviewed and/or presented Mr. Rimmer's employment records, he would have been in a better position to rebut the allegations made by the State that Mr. Rimmer had a financial motive to rob Audio Logic. This evidence would have bolstered the defense's theory of misidentification because Mr. Rimmer would have had no financial motive for committing these crimes. It would also have explained why Mr. Rimmer had such a large sum of money on him when he was arrested, and it would have refuted the State's implication that the money found on Mr. Rimmer was a result of the Audio Logic robbery.

iv.   Objections based on marital privilege

30. At trial, the State questioned Mr. Rimmer's wife about communications she had with her husband pertaining to the case. The conversations between Joanne and Robert Rimmer were protected by a statutory privilege and should never have been addressed by the prosecutor. Fla. Stat. 90.504 (A party to valid marriage may

56

refuse to disclose and prevent his or her spouse from disclosing confidential communications between the spouses made during the marriage); see Koon v. State, 463 So.2d 201, 203-204 (Fla. 1985)(reversible error to compel wife to testify to confidential communications between her and defendant husband). Yet trial counsel failed to object for no strategic reason (2SPC-R. 607).

## C.   THE STATE COURT'S DETERMINATION

31.   In denying postconviction relief, the state court determined either that trial counsel's omissions were based on strategic decisions or, alternatively, that no prejudice ensued. For instance, with regard to trial counsel's failure to present the information contained in the DOC records, the state circuit court focused, as did trial counsel, on the fact that the pertinent records were from DOC and trial counsel did not want the jury to know that Mr. Rimmer had been in prison (See SPC-R. 2411).[30]   Similarly, with regard to trial counsel's failure to rehabilitate Joanne Rimmer, the state circuit court determined that trial counsel's excuse for failing to use the information, i.e., that it was his strategy to concede that Mr. Rimmer was in possession of the stolen property (2SPC-R. 603), was "reasoned

---

[30]In affirming the denial of postconviction relief, the Florida Supreme Court determined that "[c]ompetent, substantial evidence in the record supports the court's findings, and we agree with the circuit court's conclusion that counsel's performance was not deficient." Rimmer, Nos. SC07-1272, SC09-1250, slip op. at 19.

trial strategy" (SPC-R. 2411).[31]

32. In addressing trial counsel's failure to rebut Officer Kelley's testimony, the Florida Supreme Court found that because it had previously determined that the admission of Kelley's rebuttal testimony was harmless error, "Rimmer cannot demonstrate prejudice under the second prong of Strickland." Rimmer, Nos. SC07-1272, SC09-1250, slip op. at 20. Likewise, in addressing trial counsel's failure to object based on marital privilege, the Florida Supreme Court denied relief on the basis that it had previously found the underlying issue to be without merit. Id. at 23-24.

33. Additionally, with regard to trial counsel's failure to utilize an eyewitness identification expert, the Florida Supreme Court determined that "[b]ecause counsel conducted an effective cross-examination of the eyewitnesses and consistently attacked the eyewitness identifications and the process of making those identifications, Rimmer has not demonstrated that he was prejudiced by counsel's failure to obtain an eyewitness identification expert." Id. at 20-21. And, in addressing trial counsel's failure to investigate other suspects and leads, the Florida Supreme Court determined that in light of the

---

[31]On postconviction appeal, the Florida Supreme Court stated, "We find no error in the court's determination that counsel's strategic decision was reasonable." Rimmer, Nos. SC07-1272, SC09-1250, slip op. at 23.

"overwhelming evidence of guilt, Rimmer cannot demonstrate prejudice." Id. at 22.[32]

34. Mr. Rimmer submits that the state court's determination is objectively unreasonable and its factual findings are rebutted by clear and convincing evidence. First, as to trial counsel's omissions based on strategic decisions, "Contrary to the state court's findings, simply because trial counsel claims 'strategy', this does not immune them from review." Hardwick v. Crosby, 320 F.3d 1127, 1185-86 (11th Cir. 2003). Rather, as the Eleventh Circuit Court of Appeals explained in Hardwick, 320 F.3d at 1185-86:

> In Strickland, "the Court recognized that merely invoking the word strategy to explain errors was insufficient since **'particular decisions must be directly assessed for reasonableness** [in light of] all the circumstances'"[;] "so called 'strategic' decisions that are based on a mistaken understanding of the law, or that are based on a misunderstanding of the facts are entitled to less deference."

(Emphasis added).

35. In Mr. Rimmer's case, trial counsel admitted that he

_____

[32]The "overwhelming" evidence upon which the court relied is the eyewitness testimony from Davis-Burke and Moore; the fact that Mr. Rimmer led the police on a high speed chase and threw items from the crime scene as well as the murder weapon out of his car; that Mr. Rimmer owned a car of the same description from the one seen during the robbery; and that equipment stolen from the Audio Logic and bearing Mr. Rimmer's fingerprints was found in a storage unit that Mr. Rimmer rented just days after the robbery. Id. at 21-22.

made his decision not to utilize the DOC records prior to even reviewing them (2SPC-R. 611). Thus, counsel's testimony resembles more "a *post-hoc* rationalization of counsel's conduct than an accurate description of [] [his] deliberations." Wiggins v. Smith, 539 U.S. 510, 526-27 (2003). In actuality, had trial counsel even considered the use of the records, he could have moved to preclude the State from asking any questions about where the records originated from. The records could have correctly been identified as Mr. Rimmer's treatment records. Moreover, trial counsel could have presented lay testimony from numerous witnesses about the fact that Mr. Rimmer did not wear contact lenses. This evidence independently and combined with the expert evidence was critical due to the defense that was advanced at trial, i.e., that Mr. Rimmer could not have been one of the perpetrators because none of the perpetrators wore eyeglasses. Yet, without any reasonable strategy, trial counsel failed to set forth sufficient evidence to support the most crucial issue at trial, whether Mr. Rimmer was actually at the scene of the crime.

36. As with the issue of misidentification, the state court unreasonably determined that trial counsel's decision not to rehabilitate Joanne Rimmer was a "reasoned trial strategy." Contrary to the state court's determination, Mr. Rimmer's employment records were critical in that the evidence was necessary to rehabilitate Mrs. Rimmer's credibility. Mrs. Rimmer

60

was the only witness to provide an alibi for her husband and also testified that she was in possession of the Ford Probe on the day of the crimes.  If the jury believed her, Mr. Rimmer could not be convicted.  Indeed, trial counsel was armed with evidence that would have supported Mrs. Rimmer's testimony (See Def. Ex. 20). Yet, trial counsel simply allowed the State's attack of Mrs. Rimmer's credibility to go unrebutted.

37.  Moreover, it was the State's theory that Mr. Rimmer was in desperate need of money and therefore he committed the robberies.  The State's theory also supported aggravating circumstances, if the jury believed it.  However, trial counsel could have rebutted the State's theory and the aggravating factors by showing the jury that Mr. Rimmer possessed a large quantity of money when he was arrested because he had recently been paid over $2000.00 for unused annual leave (Def. Ex. 20). If trial counsel had any strategy in failing to present the evidence of how Mr. Rimmer came into possession of the large amount of money, it was certainly not reasonable. See Hardwick, 320 F.3d at 1185-86.

38.  In denying the other instances of trial counsel's omissions based on either a lack of prejudice, or on the fact that there was "overwhelming evidence of guilt", the state court utilized an analysis that is contrary to clearly established United States Supreme Court precedent.  The state court

61

erroneously addressed Mr. Rimmer's arguments in a piecemeal
fashion, rather than the correct analysis that considers the
total picture of the errors and lack of investigation that
plagued trial counsel's representation of Mr. Rimmer.  As the
Supreme Court has explained, the "prejudice" component of a <u>Brady</u>
standard, the same standard as the one used for ineffective
assistance of counsel claims, requires evaluation of the evidence
that the jury did not hear "collectively, not item-by-item."
<u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995).  Here, the state
court's failure to conduct a proper analysis is objectively
unreasonable.

39.  Moreover, in denying Mr. Rimmer's claim on the basis
that there was "overwhelming evidence of guilt", the state court
relied on an "identification" by Davis-Burke and Moore, yet
failed to consider the fact that Davis-Burke's initial
identification of the shooter was not Mr. Rimmer and the only
reason she even considered Mr. Rimmer was because Detective Lewis
told her that her boyfriend had selected him.  Thus, while Davis-
Burke was the only witness who had any opportunity to observe the
shooter, she did not select Mr. Rimmer as that individual without
prompting from the lead detective.

40.  As to the other evidence that the state court pointed
to as "overwhelming evidence of guilt", none of the evidence
links Mr. Rimmer to the crime scene, but rather suggests that he

<div align="center">62</div>

came into possession of the stolen merchandise after the crimes. And, specifically as to Mr. Rimmer's ownership of the Ford Probe, much evidence suggests that it was not his Ford Probe that was at the scene of the crime. For example, Moore described the Probe as having peeling tint on the windows (R. 907), but Mr. Rimmer's vehicle did not have peeling tint. And, Davis-Burke described the Probe as having alloy wheels, but Mr. Rimmer's vehicle did not have alloy wheels. Also, numerous Ford Probes like the one described by the eyewitnesses were seen near the crime scene shortly after the crime, yet law enforcement did not investigate those leads. And, Mr. Rimmer's wife testified that she drove the Ford Probe and was driving it on the morning of the crimes. In short, the state court ignored the evidence that undermines the suggestion that Mr. Rimmer's ownership of a Ford Probe was "overwhelming evidence of guilt".

41. Further, trial counsel testified that his theory was to concede that Mr. Rimmer came into possession of the stolen merchandise after the crimes, but that he was not involved in the robbery-homicides. Thus, the evidence of leads and other suspects could have undermined the State's theory of the case while bolstering the defense theory. Indeed, as Justice Pariente wrote in her dissent on direct appeal, which was joined by two other justices:

> Certainly, there was an abundance of evidence
> that linked Rimmer to the crime in that he

63

possessed the stolen goods. **However, there was no physical evidence that linked him to the scene. Moreover, a third man involved with the crimes was never found.**

Although Rimmer was identified by two eyewitnesses, not only were there flaws with the procedures used, but I point out that both eyewitnesses identified the shooter as being five feet, ten inches tall and not wearing glasses, whereas Rimmer is six feet, two inches tall and is legally blind without his glasses. Furthermore, there was a discrepancy about Rimmer's weight.

Rimmer, 825 So. 2d at 339 (Pariente, J., concurring in part and dissenting in part, in which Anstead, C.J., and Shaw, J., concur)(emphasis added).

42.   The state court's characterization that there was "overwhelming evidence of guilt" is rebutted by clear and convincing evidence.   Rather, other than the severely flawed eyewitness identifications,[33] there was absolutely no evidence linking Mr. Rimmer to the scene of the crimes.   Contrary to the state court's analysis, prejudice is not to be analyzed as a "sufficiency of evidence test." See Kyles, 514 U.S. at 434. Rather, Mr. Rimmer must only show "that there is a reasonable

---

[33]At trial, the witnesses testified that the shooter, (who was identified as Mr. Rimmer), had touched shelves, doors and the cars.   However none of Mr. Rimmer's fingerprints were identified at the scene and numerous fingerprints were unidentified, including fingerprints from Davis-Burke's vehicle (R. 1140-41), the door leading to the office at Audio Logic (R. 1141), the front door of the Audio Logic store (R. 1143), the cash register (R. 1143), the shelf in the storage area (R. 1144), the duct tape used to bind the victims (R. 1144-45), and other equipment and boxes (R. 1141, 1145-48).

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

**D.    CONCLUSION**

43.  Had trial counsel effectively represented Mr. Rimmer, he could have shown that it was impossible for him to be the individual who committed the crimes at issue and that the State's theory was flawed.  The eyewitness identifications were seriously suspect and inconsistent; there was no physical evidence placing Mr. Rimmer at the crime scene; and Mr. Rimmer had an alibi for the time of the crimes.  Trial counsel also could have shown that the State failed to fully investigate the case and simply rushed to judgment in prosecuting Mr. Rimmer.  The fact that there were other suspects who were not fully investigated combined with the evidence that fingerprints were found at the scene in key areas that did not match Mr. Rimmer or any of the victims would have been powerful evidence to establish reasonable doubt.  In denying relief, the state court's determination was contrary to and an unreasonable application of clearly established federal law. Habeas relief is warranted.

<div align="center">

**GROUND II**

**MR. RIMMER WAS DENIED AN ADEQUATE ADVERSARIAL
TESTING AT THE SENTENCING PHASE OF HIS TRIAL, IN
VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

</div>

<div align="center">

65

</div>

**TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PREPARE MITIGATING EVIDENCE AND TO ADEQUATELY CHALLENGE THE STATE'S CASE.  AS A RESULT, THE DEATH SENTENCES ARE UNRELIABLE.**

All factual assertions contained in the procedural history and elsewhere in this petition are fully incorporated herein by specific reference.  This claim is evidenced by the following:

**A.   INTRODUCTION**

1.   An ineffective assistance of counsel claim is comprised of two components:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Williams v. Taylor, 120 S.Ct. 1495, 1511 (2000), quoting Strickland, 466 U.S. at 687.  "[T]o establish ineffectiveness, a 'defendant must show that counsel's performance fell below an objective standard of reasonableness.'"  Williams, 120 S.Ct. at 1511, quoting Strickland, 466 U.S. at 688.

2.   In Williams, the Supreme Court found deficient performance where counsel failed to prepare for the penalty phase of a capital case until a week before trial, "failed to conduct an investigation that would have uncovered extensive records," "failed to seek prison records," and "failed to return phone calls of a certified public accountant." 120 S.Ct. at 1514.  In

66

her concurring opinion, Justice O'Connor explained that "trial counsel failed to conduct investigation that would have uncovered substantial amounts of mitigation," and as a result, this was a "failure to conduct the requisite, diligent investigation." Id. at 1524.

3.     In Wiggins v. Smith, 539 U.S. 510 (2003), the Supreme Court discussed counsel's decision to limit the scope of the investigation into potential mitigating evidence and the reasonableness of counsel's investigation.  The Court said:

> [A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.  Even assuming [trial counsel] limited the scope of their investigation for strategic reasons, Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

Wiggins, 539 U.S. at 527.

4.     Subsequently, in Porter v. McCollum, 130 S.Ct. 447, 454 (2009), the Supreme Court found deficient performance where "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability."  As the Supreme Court noted, "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable." Porter, 130 S.Ct. at 454, quoting Penry v. Lynaugh, 492 U.S. 302, 319

67

(1989).

**B.    DEFICIENT PERFORMANCE**

       i.    *Trial counsel's failure to conduct a reasonable investigation*

     5.    In <u>Porter v. McCollum</u>, trial counsel failed to obtain any of Porter's school, medical, or military service records, nor did he interview any members of Porter's family. 130 S.Ct. at 453.   In fact, counsel did not interview witnesses or request records. <u>Id</u>.  "Beyond that, like the counsel in *Wiggins,* [] [trial counsel] ignored pertinent avenues for investigation of which he should have been aware." <u>Id</u>.  As a result, the Supreme Court determined that "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." <u>Id</u>. at 454.

     6.    Similar to <u>Porter</u>, Mr. Rimmer's trial counsel failed in his duty to conduct a reasonable investigation, including an investigation of Mr. Rimmer's background, for possible mitigating evidence.   Almost three months after Mr. Rimmer had been arrested for the double homicide at the Audio Logic, Ken Malnick was appointed as penalty phase counsel (2SPC-R. 432).   Malnick withdrew almost four months later without having conducted any investigation into mitigation, other than speaking to Mr. Rimmer (2SPC-R. 433-34).   Thus, from the outset and for over seven months, the penalty phase investigation in Mr. Rimmer's case was

<div align="center">68</div>

non-existent.

7.     Hale Schantz was appointed to replace Malnik on December 1, 1998. On December 16, 1998, Schantz requested the appointment of a mental health expert (R. 2191). On December 31, 1998, the trial court appointed Dr. Martha Jacobson to evaluate Mr. Rimmer. Dr. Jacobson met with Mr. Rimmer on January 7 and 11, 1999 (2SPC-R. 144). However, Dr. Jacobson did not receive any background records or collateral information about Mr. Rimmer (2SPC-R. 145).[34] Thus, Dr. Jacobson's 1999 report and testimony was based entirely on Mr. Rimmer's self-report and some psychological testing.

8.     Schantz's communications with Dr. Jacobson were very limited: They had a brief telephone conversation on January 5, 1999, wherein Schantz told her a few facts about the crime (2SPC-R. 140). Once Dr. Jacobson issued her report, the two never had a conference about possible mitigation or her testimony (2SPC-R. 153; R. 1931).

9.     Prior to his investigation, Mr. Rimmer provided Schantz information about his immediate family and how to contact them (see Def. Ex. 21), and a list of 24 potential mitigation witnesses, several of whom he had listed contact information (See Def. Ex. 22). The list included friends, individuals from his

---

[34]Trial counsel provided Dr. Jacobson with the grand jury indictment, two police reports detailing the incident, and the arrest affidavit (2SPC-R. 143).

69

work, school, church and his children's teachers (Id.).

10.   Between January 8-15, 1999, Schantz spoke to Mr.
Rimmer's father, mother, wife and children, two individuals from
Mr. Rimmer's place of employment and one friend.[35]  Schantz did
not speak to any other relatives or any of the other 22
individuals on Mr. Rimmer's list (2SPC-R. 457, 476).

11.   Schantz did not obtain or review any background
records, including school records, employment records or prison
records (SPC-R. 441, 443, 447, 451).  The witness interviews
occurring the week of January 8-15, 1999, and limited contact
with Dr. Jacobson reflects the extent of Schantz's penalty phase
investigation.

12.   In assessing deficient performance in Porter, the
Supreme Court determined that, "It is unquestioned that under the
prevailing professional norms at the time of Porter's trial,
counsel had an 'obligation to conduct a thorough investigation of
the defendant's background.' Williams v. Taylor, 529 U.S. 362,
396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)." Porter, 130 S.Ct.
at 452-53.  The Supreme Court concluded that "[t]he investigation
conducted by Porter's counsel clearly did not satisfy those
norms." Id. at 452-53.

13.   Similar to Porter, Mr. Rimmer's trial counsel failed to

---

[35]Melodie Fritzinger and Henry Morris were included on Mr.
Rimmer's list (See Def. Ex. 22).

fulfill his obligations under the prevailing professional norms

in existence at the time. Despite the "duty of the lawyer to

conduct a prompt investigation of the circumstances of the case

and to explore all avenues leading to facts relevant to the

merits of the case and the penalty in the event of conviction,"

ABA Guidelines for the Appointment and Performance of Counsel in

Death Penalty Cases 11.4.1 (c) at 93 (1989), Mr. Rimmer's trial

counsel conducted little penalty phase investigation. Just as in

Porter, Mr. Rimmer's trial counsel rendered constitutionally

deficient performance.

   *ii.   Failure to object*

   14.   Trial counsel failed to object when the prosecutor made

unsupported claims about the fear that one of the victims

experienced prior to his death. During the penalty phase closing

arguments, the State asserted the following:

> Aaron Knight, duct-taped, hands behind his back,
> laying down on the floor, depicted here in State's
> 4 in evidence, as depicted in State's 6 and 7,
> State's 6 and 7, the 10- to 20-minute period in
> which Aaron was down on the floor, face down, the
> terror and the thoughts that went through his
> mind, that then a car starts to drive and stops.

(R. 1954). The prosecutor's statements about the suffering

experienced by the victim was not a "fair comment upon the

evidence" (R. 930), as there was no evidence in the record

regarding how the victim felt before he was killed.

   15.   Additionally, trial counsel failed to object when the

71

prosecutor re-enacted the crime during his penalty phase closing

argument by wielding the gun from the crime in front of the jury

and pulling the trigger:

> Judge, I have already cleared State's 60 with your
> bailiffs.  Defendant Rimmer walks up to Aaron
> Knight, back from his car, and says, "You know me,
> don't you?"  And Aaron Knight says, "No."  And
> then what does the defendant do?"  **("Click" from
> the gun.)**  Shoots him in the back of the head.

(R. 1955).

* * *

> And then we know that Rimmer walked over to
> Bradley Krause and then shot him in the head.
> **("Click" from the gun.)**

(R. 1956).

16.  The cumulative effect of the prosecutor's comments was

to "improperly appeal to the jury's passions and prejudices."

Cunningham v. Zant, 928 F.2d 1006, 1020 (11th Cir. 1991).  Such

remarks prejudicially affect the substantial rights of the

defendant when they "so infect the trial with unfairness as to

make the resulting conviction a denial of due process." Donnelly

v. DeChristoforo, 416 U.S. 647 (1974); see also, United States v.

Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991).  Here, the

prosecutor's argument went beyond a review of the evidence and

permissible inferences.  He intended his argument to overshadow

any logical analysis of the evidence and to generate an emotional

response, a clear violation of Penry v. Lynaugh, 492 U.S. 302

(1989).  He intended that Mr. Rimmer's jury consider factors

72

outside the scope of the evidence.

17.  Arguments such as those made by the State at Mr. Rimmer's penalty phase violate due process and the Eighth Amendment, and render a death sentence fundamentally unfair and unreliable. See Drake v. Kemp, 762 F.2d 1449, 1458-61 (11th Cir. 1985)(en banc); Potts v. Zant, 734 F.2d 526, 536 (11th Cir. 1984); Wilson v. Kemp, 777 F.2d 621 (11th Cir. 1985).  In the instant case, as in Wilson, the prosecutor's comments and closing argument "tend[ed] to mislead the jury about the proper scope of its deliberations."  Wilson, 777 F.2d at 626.  In such circumstances, "[w]hen core Eighth Amendment concerns are substantially impinged upon . . . confidence in the jury's decision will be undermined." Id. at 627.

**C.   PREJUDICE**

*i.   The evidence at trial*

18.  At Mr. Rimmer's penalty phase, trial counsel presented a few witnesses for mitigation purposes: Mr. Rimmer's father, Louis, told the jury that he and his wife had fought often when Robert was young (R. 1870).  The couple divorced when Robert was nine, and the children remained with their father (R. 1868). However, a few years later, Mrs. Rimmer took her children to North Carolina without permission or any notice (R. 1868-69). She told her children that their father had died (R. 1869).  A few months later, Louis Rimmer found his children and took them

73

back to Ohio (R. 1870). Louis Rimmer told the jury that his son was a good student and a loveable son (R. 1871). Eventually, Louis Rimmer sent his children to live with their mother in Florida (R. 1872).

19.    The jury also learned that Mr. Rimmer had four children, one of whom was not his biological child, but that he had raised since she was an infant (R. 1873, 1936-37). Mr. Rimmer spent time with his children; he took them to the park or fishing, and often helped with their homework (R. 1939, 1942-43). He also joined the PTA at their school (R. 1939). Additionally, Mr. Rimmer was a good friend and community member according to Henry Morris (R. 1881-86). He attended church and worked with kids in gangs (R. 1882-83).

20.    The manager and supervisor at Mr. Rimmer's place of employment described his work at John Knox Village, which was a retirement community for seniors (R. 1876). They both agreed that Mr. Rimmer was an excellent employee (R. 1877, 1880). He interacted well with the residents (R. 1877). Mr. Rimmer's supervisor told the jury that Mr. Rimmer had received a few promotions and a scholarship to attend school in the evenings (R. 1879-80).

21.    Dr. Martha Jacobson testified before the jury that Mr. Rimmer suffered from a schizophrenic disorder with some mood

74

disorder and depression (R. 1904).[36]  Dr. Jacobson believed that
Mr. Rimmer's condition was chronic (R. 1901).  She formed her
conclusion based on some psychological testing and an interview
with Mr. Rimmer (R. 1893-94).  The results of Mr. Rimmer's
testing demonstrated a bizarre thought process, paranoia and
mania (R. 1896-97, 1899).  Dr. Jacobson explained that the
results showed that Mr. Rimmer was not in touch with reality and
hallucinated (R. 1898).

22.  On cross-examination, the State elicited that Dr.
Jacobson had no evidence of Mr. Rimmer having mental problems in
the past (R. 1910-11).  And, though Dr. Jacobson informed the
jury that Mr. Rimmer told her that he had seen a mental health
professional while previously incarcerated, she admitted that she
was never provided records to confirm that (R. 1914-15).   The
State asked:

> Q: Now, with respect to the information that
> you had about Defendant Rimmer, and this major
> mental disorder that you are of the opinion that
> he suffers from, prior to your evaluation of the
> defendant, was there any evidence of the
> defendant's mental problems?
>
> A: I did not have any evidence of that.

_____

[36]Dr. Jacobson told the jury that "[t]here seems to be a
strong genetic component to schizophrenia." (R. 1901).  Dr.
Jacobson mentioned that if an individual was diagnosed with
schizophrenia there was a significant increase in the likelihood
of a sibling being diagnosed with schizophrenia (Id.).  However,
there was no evidence of Mr. Rimmer's siblings being diagnosed or
treated for schizophrenia presented to the jury or judge.

Q: You had no evidence that the defendant ever reported this major mental disorder to a counselor?

A: Correct.

Q: You had no evidence that the defendant ever reported this major mental disorder to a social worker, correct?

A: Correct.

Q: You had no evidence that the defendant ever reported this mental problem to a licensed clinical social worker, correct?

A: Yes.

Q: You had no evidence that the defendant ever reported this  mental problem to a mental health counselor, correct?

A: Yes.

Q: You had no evidence that the defendant ever reported this mental problem to a therapist, correct?

A: Yes.

Q: You had no evidence that the defendant ever reported this problem to a psychotherapist; is that correct?

A: Yes.

Q: You had no evidence that the defendant ever reported this problem to a marriage and family therapist, correct?

A: I had no evidence, correct.

Q: You had no evidence that the defendant ever reported this to a psychiatrist, correct?

A: Correct.

Q: You had no evidence that the defendant

76

ever reported this to a psychologist, correct?

A: Correct.

Q: Wouldn't the absence of, lack of all of this evidence lead one to believe that this heretofore undiagnosed mental disorder that the defendant suffers from is only in a mild form?

A: Not to me, sir.

* * *

A: I asked Mr. Rimmer if he had ever seen a mental health professional before.

Q: And that's all you did?

A: When he, he told me he had never seen a mental health professional before except when he was in the Appalachian Correctional Institute.

Q: And you never did any follow-up anywhere to see if he had been seen by anybody else?

A: No, sir.

Q: Didn't you think it would be important for these folks to know if in fact he had been seen or treated at some other place for this mental problem?

* * *

Q: Ma'am, you did not even attempt to locate that information, did you, other than speaking to the defendant?

A: That's correct, Mr. Magrino.

Q: Now, you mentioned Appalachian Correctional Institute.  You knew that the defendant had served prison sentences in the past, correct?

A: That's correct, he gave me that information.

77

        Q: Did you review any of the defendant's
prison records to see if he had reported any
mental problem to any of the social workers at the
prison?

        A: No, I did not.

        Q: Did you review any prison records to see
if the defendant had reported any mental problems
to his classification officers in the prison?

        A: No.

        Q: Did you review any prison records to see
if the defendant had reported this mental problem
to any prison psychiatrist or prison
psychologists?

        A: No.

(R. 1910-15).

        23.   During the State's closing argument, the prosecutor

referred to Dr. Jacobson's testimony as "mental mumbo-jumbo" (R.

1951).  And, the State emphasized that there was no factual basis

to support Dr. Jacobson's opinions (Id.).  The State argued:

        If you all want to give any credence of
testimony to her, go right ahead.  I can't stop
you.  But I submit to you, based upon the answers
that she gave during cross-examination, she did
what she was paid to do.  She gave you a non-
opinion on some mental mumbo-jumbo, with no
factual basis to support it.  **And without her even
taking the time to do any investigation with
respect to the defendant's background.**

(R. 1951)(emphasis added).  The State argued that Mr. Rimmer

simply had antisocial personality disorder (R. 1959).

        24.   The jury recommended death sentences for Mr. Rimmer, by

votes of 9-3.  Thereafter, a Spencer hearing was held in March,

                                78

1999, at which trial counsel presented testimony from Dr. Michael
Walczak and Mr. Rimmer's mother.  Dr. Walczak confirmed Dr.
Jacobson's diagnosis (R. 2011), and also told the trial court
that Mr. Rimmer suffered an abusive childhood (R. 2013).  Like
Dr. Jacobson, Dr. Walczak had not reviewed any background
materials (R. 2034, 2037).

     25.  Lilly Rimmer, Mr. Rimmer's mother, explained that she
had taken her children from their father, but she presented a
somewhat different picture of Louis Rimmer, telling the trial
court that he was not involved with his children and refused to
let her have contact with them (R. 2049-51).

     26.  The trial court imposed the death penalty finding that
six of the aggravating factors had been established (R. 2386-
92).[37]  As to mitigation, the trial court found no statutory
mitigation had been established (R. 2393-94).  And as to non-
statutory mitigation, the trial court found some had been
established but assigned these factors very little weight. (See
R. 2394-97).  Specifically, as to mental health mitigation, the
trial court found:

> Both experts stated that the Defendant, now age
> 31, has a mental disorder, however, **there was no
> documented history of mental illness.  Considering
> the number of contacts this defendant has had with
> the criminal justice system, through attorneys,**

---

[37]The trial court did not find that the State had
established pecuniary gain, though the jury was instructed to
consider this aggaravtor (R. 2389-90).

> **inmate classifications and reviews, the absence of
> any history of mental illness was of probative
> value.**
>
> * * *
>
> Both doctors testified that the Defendant has a
> psychotic disorder characterized by distorted
> thinking and perceptions. **From the evidence
> presented, the Court is not persuaded that the
> Defendant has a major mental illness.**

(R. 2396-97)(emphasis added).

27. On direct appeal, the Florida Supreme Court held that
the evidence did not support the HAC aggravator. However, the
Court found that the error was harmless and characterized the
mitigation presented by Mr. Rimmer as "minimal". Rimmer, 825 So.
2d at 329.

*ii. The evidence at the postconviction evidentiary hearing*

28. During Mr. Rimmer's postconviction proceedings, he
presented a detailed history of his background and social
history. The mitigation presented at Mr. Rimmer's postconviction
evidentiary hearing was both qualitatively and quantitatively
different than the mitigation presented at trial.

29. Robert Rimmer's life began when he was born to an
unhappy and despondent mother who had only married his father
because she was pregnant with Robert's older brother, Louis
O'Dell (2SPC-R. 108, 14, 103). Jeanette Rimmer, Mr. Rimmer's
aunt by marriage, testified that there were problems between
Robert's mother and father even before they were married (2SPC-R.
103). Louis Rimmer was unfaithful and spent money on prostitutes

80

(2SPC-R. 104).  Despite the problems, the Rimmers had three sons – Louis O'Dell, Robert and Raymond (2SPC-R. 12).  Lilly Rimmer believed that though she tried to be a good mother, she was unable to because of her own unhappiness (2SPC-R. 18).  Jeanette Rimmer concurred and explained that there was a lot of fear and anger in the house but, "there wasn't love." (2SPC-R. 105).

30.  Lilly Rimmer also confirmed that, while married, she and her husband argued frequently – two to three times a week (2SPC-R. 15-16, 195-96).  Oftentimes the arguments would result in physical violence (Id.).  In their tender years, Louis O'Dell and Robert would try to intervene in the arguments and comfort their mother (2SPC-R. 15).  However, Louis O'Dell testified that when he and Robert intervened, his father would then "whoop" them, though not in front of their mother (2SPC-R. 197)

31.  Lilly Rimmer described her husband as a "present, non-existent father" (2SPC-R. 16).  She explained that her husband neither cared for nor spent any time with his children (Id.).  Jeanette Rimmer confirmed that Louis Rimmer was not nurturing and lacked parenting skills (2SPC-R. 112).  He got angry with his children over minor things, or nothing at all (2SPC-R. 17, 125).  He would yell at them and make them feel bad (Id.).

32.  Lilly Rimmer left her husband and took her children after an incident in which she and her husband were fighting and her eldest son wielded a knife and threatened his father (2SPC-R.

193-96, 196-97).  Her husband responded by pushing her son down a flight of stairs (Id.).  Robert witnessed this incident (2SPC-R. 20).  Lilly did not tell her husband that she was leaving or where she was going (Id.).  She took the children to North Carolina and enrolled them in school (2SPC-R. 21, 198).  Her children were relieved to be away from the volatile situation (2SPC-R. 22).  Louis O'Dell described that he and Robert were happy to leave their father because their mother was nice and calm when their dad was not around (2SPC-R. 199).

33.  Though Louis Rimmer did not seem concerned about the loss of his children (2SPC-R. 114), a few months later, he found them and asked that they be allowed to accompany him to Ohio during their holiday break (2SPC-R. 23-24).  Though the children did not want to go, Lilly allowed her husband to take them (Id.; 2SPC-R. 201).  The Rimmer children were scared and nervous about their father beating them (2SPC-R. 201).

34.  A few weeks later, Louis Rimmer refused to return the children (2SPC-R. 25), and told them that their mother would not be back (2SPC-R. 120).  Due to financial constraints, it took Lilly over a year to get back to Ohio (2SPC-R. 26).  Upon her return, her husband refused to allow her to see or speak to the children (Id.).  Years later, Lilly learned that Louis Rimmer had told them that she did not want or love them anymore (2SPC-R. 26-27).

35.    Jeanette Rimmer testified that while in their father's custody, her nephews were fearful of him due to the fact that he beat them (2SPC-R. 106, 111, 121).   Several times a week, even daily, Mr. Rimmer's father would beat his children with a razor strap, belts, extension cords, his hands and other implements for seemingly no reason (2SPC-R. 108, 120, 122, 125, 202).   Louis O'Dell confirmed that the beatings were over small things or nothing – their dad was moody (2SPC-R. 202).[38]

36.    Louis Rimmer also left the children unsupervised. Jeanette Rimmer tried to check on her nephews after work (2SPC-R. 116).   She attempted to make sure her nephews had food to eat and completed their homework (2SPC-R. 117, 204).   Louis O'Dell was sure that if not for his aunt, he and his brothers would not have eaten (2SPC-R. 204).   Jeanette Rimmer found the boys unsupervised, without any toys or things to occupy their time (2SPC-R. 118).   The children were also not allowed to leave the house (2SPC-R. 123, 203).   Robert and his brothers were unhappy (2SPC-R. 201).

37.    At some point, Robert's father began a relationship with another woman who had children of her own (2SPC-R. 124). His neglect and anger toward his own children grew.   According to Jeannete Rimmer, Louis Rimmer's family confronted him about his

---

[38]Dr. Sultan characterized Louis' beatings as: "he punished the children for simply behaving as children" (2SPC-R. 300).

behavior and urged him to seek psychological help (2SPC-R. 126).
Louis Rimmer later reported that he was told he was depressed and
needed medication (Id.).

38.  In 1980, Lilly Rimmer moved to Florida and a few months
later, her husband sent the children to live with her (2SPC-R.
28).  Lilly's children, including Robert who was just a teenager,
were distant and confused (2SPC-R. 29).  She noticed that the
children had scars and welts on their bodies as though they had
been badly beaten (2SPC-R. 30).  Her children confirmed that
their father had beaten them, sometimes extremely badly (Id.).
They also confided that their father had kept them in the house
for long periods of time often without food (Id.; see also 2SPC-
R. 124).  Though the children were happy to be with their mother,
Louis O'Dell explained that they were still afraid that their dad
may come back for them (2SPC-R. 207).

39.  Lilly Rimmer felt her sons needed counseling and
attempted to get them some through school, but was never able to
(2SPC-R. 32).  She also noticed that Louis O'Dell started to get
into trouble.  He had a temper that he could not control (2SPC-R.
35-36).  Robert spent much of his time with his brother and
started to emulate his behaviors (2SPC-R. 209).  He, too, began
to skip school and get into trouble (2SPC-R. 39, 209).  The State
eventually removed him from his home and placed him in a group
home because Lilly's parenting skills were ineffective (Id.).

40.   Robert Rimmer did not graduate from school, but did earn his GED (2SPC-R. 40).  He also started working at sixteen (2SPC-R. 41).  He worked for John Knox Village, a retirement home, for several years where he was promoted and earned a scholarship to continue his vocational training (SPC-R. 1879-80). Mr. Rimmer's supervisor testified that he was an excellent employee who went above and beyond the call of duty (2SPC-R. 94).

41.   While working at John Knox Village and going to school, Mr. Rimmer met Stewart Weiss, the owner of an auto repair shop (2SPC-R. 83), and George Wellington, one of the employees of the shop.  Mr. Rimmer came to Weiss' shop one day because he needed a part for his vehicle (Id.).  Weiss said he could repair the vehicle, but Mr. Rimmer did not have the money (Id.).  Weiss repaired the vehicle and told Mr. Rimmer to return the next day with the money (Id.).  Mr. Rimmer did.  From that day on, until his arrest, Mr. Rimmer voluntarily worked at Weiss' repair shop two or three times a week in order to learn more about auto repair (2SPC-R. 84).  Weiss described Mr. Rimmer as an honest, trustworthy volunteer employee who was eager to learn (2SPC-R. 85).  Indeed, Wellington trained Mr. Rimmer and also felt that Mr. Rimmer was trustworthy (2SPC-R. 252-53).  Mr. Rimmer's goal was to own a repair shop of his own one day (2SPC-R. 98).

42.   Everyone who knew Mr. Rimmer knew him to be a concerned and caring father who spent time with his children (2SPC-R. 42,

85